NICHOLAS S. HODGE & another[1] *vs.* WAYNE KLUG.

No. 92-P-154.

Middlesex. September 22, 1992. - December 28, 1992.

Present: BROWN, KASS, & IRELAND, JJ.

*Practice, Civil,* Notice of appeal, Counterclaim and cross-claim, Amendment, Attorney's fees, Costs. *Rules of Appellate Procedure. Landlord and Tenant,* Tenancy at sufferance. *Summary Process,* Notice to quit, Appeal.

In a summary process action, the defendant's notice of appeal filed prematurely, one day before entry of judgment on a separate piece of paper in accordance with Mass.R.Civ.P. 58(a), was adequate to commence the appellate process, where no motion had been filed to alter the judgment, and where the belated entry of the final judgment was a purely mechanical failing by a court clerk. [750-751]

In a summary process action, the judge correctly denied the defendant's motion to amend his answer by adding new counterclaims, where denial of the motion was warranted by the defendant's undue delay, bad faith, and dilatory motive, undue prejudice to the plaintiffs, and the defendant's introduction of entirely new theories of liability when trial was imminent. [751-752, 755-758] BROWN, J., concurring.

The court was of the view that the rights afforded under G. L. c. 239, § 8A, to persons occupying premises for dwelling purposes are available to a tenant at sufferance. [752-755]

This court, although denying the plaintiffs' request for an award under Mass.R.A.P. 25 of double costs and counsel fees incident to an appeal, questioned whether defendant's attorneys' assisting their client in raising opportunistic defenses and making highly doubtful claims of indigence, causing great expense and emotional hardship to the opposing parties, was consistent with professional responsibility. [758-759] BROWN, J., concurring.

SUMMARY PROCESS. Complaint filed in the Lowell Division of the District Court Department on July 11, 1990.

On appeal to the Superior Court Department the case was heard by *George A. O'Toole, Jr.,* J.

[1]Maya Ruettger-Cruciana.

*Lee D. Goldstein (Jeffrey M. Feuer* with him) for the defendant.

*Daniel J. Lyne, II (Kara L. Thornton* with him) for the plaintiffs

*Charles Harak & Judith Liben,* for Massachusetts Tenants Organization, amicus curiae, submitted a brief.

KASS, J. Rather than coming to a "just, speedy, and inexpensive determination" of a summary process action (see Uniform Summary Process Rule 1 [1980]), this litigation, begun approximately two and one-half years ago, has been protracted and expensive and, thereby, a reproach to justice. The failure is not systemic but the consequence of an arrogant defendant abetted by overweening counsel. We affirm the judgment of possession and damages in favor of the plaintiff.

These, in summary, are the facts, drawn — with some supplement from the record — from careful findings made by a judge of the Superior Court. In August, 1981, the defendant Klug took up residence in a slate-roofed cottage (the cottage) converted from a carriage house. In the cottage were a living room, bedroom, kitchen, bathroom, full basement, and attic. The cottage is an accessory structure located on a fifteen-acre estate (the property) on the Bedford-Billerica line adjoining a wildlife preserve along the Concord River. Klug's occupancy arrangment, a tenancy at will, rent payable monthly in advance, was made orally with the then owners of the property, the trustees of the Estate of Edward Pickman Trust. Rent at the inception of Klug's tenancy was $275 per month, and that climbed to $400 over time. Throughout his occupancy, Klug paid for his utilities: heating fuel, hot water, and electricity.

During a period overlapping 1987 and 1988, Klug made some repairs on the premises, including carpentry and painting. For his work and materials, the trustees gave Klug a credit against his rent. He paid no cash on account of rent from August, 1987, to April, 1989, when, by his own calculation, his credit was used up.

In September, 1989, the trustees[2] decided to sell the property and by letter dated September 11, 1989, notified Klug that he was to vacate the cottage "as of October 31, 1989." Klug replied with a letter to Lawrence Coolidge (see note 2) requesting that he be allowed to stay on while the property was on the market. "Prospective buyers could be informed," Klug wrote, "that the tenant was prepared to vacate if necessary, and that the family would handle the details." Coolidge responded with a letter that "the notice . . . to vacate still stands." Unmoved, Klug tried to pay the October and November rent. His check was returned by a lawyer for the trustees with a letter dated October 31, 1989, reminding Klug that his tenancy had expired as of that day. A separate lawyer's letter restated, in more formal and formulaic fashion, Coolidge's earlier notice to quit.[3]

Klug did not leave the cottage. He wrote to the plaintiffs, when he became aware that they were prospective purchasers of the property, about his attachment to the cottage and the land, which had deepened during his occupancy, urging that he be allowed to continue to rent the cottage or to buy it. The plaintiffs replied promptly that they had entered into a contract to buy the property on the basis of information from the owners that Klug was moving out of the cottage. They rejected Klug's various proposals, not least because they intended to make the cottage available to the plaintiff Ruettger-Cruciana's father who, so Ruettger-Cruciana wrote to Klug, "is on in years and declining in health, yet cherishes a measure of independence." The cottage, she explained, was

---

[2]The Estate of Edward Pickman Trust had by this time changed its name to the Pickman Liquidating Trust. The trustees were the same and the particular trustee who dealt with Klug was Lawrence Coolidge, to whom Klug had always sent rent.

[3]The first notice had been warm and friendly in tone. The second, expressed as given without prejudice to the first, invoked familiar usage: "It being the intention of the Trustees of the Pickman Liquidating Trust to terminate your tenancy, you are hereby notifed to quit and deliver up at the expiration of that month of your tenancy which shall begin next after this date, the premises now held by you as tenant . . . ."

a way to offer him care, companionship, and autonomy.[4] This was not persuasive to Klug. On January 30, 1990, he wrote to Ruettger-Cruciana about his "sense not of owning this land but of being owned by it." Although Klug claimed to "understand and truly sympathize with your desire to put your father in the cottage, it can only represent to me the forceful attempt to superimpose an untried plan upon an established reality which has earned a right to survive."

Meanwhile, the conveyance of the property by the trustees to the plaintiffs had been consummated, a deed dated January 11, 1990, having been recorded in the North Middlesex Registry of Deeds on January 13, 1990. As a final act, the trustees sent a third notice to quit to Klug on January 12, 1990. Klug did not budge and, indeed, seemed to have lost a "belief" in paying rent to which he had earlier given sanctimonious voice;[5] he made no payments for his occupancy of the cottage after January 30, 1990. Although the trustees had initiated two summary process actions while they still held title to the property, the new owners brought a fresh summary process action in their names on July 11, 1990.[6] That action had been preceded by the new owners' notice to quit dated May 25, 1990.

1. *Threshold issues.* a. Shortly after argument of the case, we learned through a motion filed by the plaintiffs for the return of certain personal property that Klug on October 6, 1992, vacated the cottage. A major aspect of the case, right to possession, therefore, became moot, although no party has filed a suggestion of mootness. As there is a monetary component to the judgment (the use and occupancy damages) which survives, we are obliged to consider the appeal.

---

[4]Unfortunately, Ruettger-Cruciana's father later died, without ever being able to enjoy the support and proximity of his children as they had envisioned.

[5]Klug's letter of January 30, 1990, to Ruettger-Cruciana, which dwelled at length about the roots Klug felt he had sunk into the property and proposed purchase of a portion of it, concluded: "Meanwhile, I believe in paying rent for the cottage so long as I'm living in it, and have enclosed a check for February."

[6]Two summary process actions had been brought by the trustees. They were dismissed March 8, 1990, at the request of counsel for the plaintiffs.

b. The plaintiffs, Hodge and Ruettger-Cruciana, invite us to dismiss the appeal on the ground that Klug's notice of appeal was prematurely filed. Findings of fact and an order for judgment (immediate possession for the plaintiffs and $10,500 plus interest for use and occupancy) were entered on the Superior Court docket on April 25, 1991. Although under Uniform Summary Process Rule 10(d) (1982), a summary process judgment "shall be entered at 10:00 A.M. on the next business day following the court's decision," a judgment on a separate piece of paper (conformably with Mass.R.Civ.P. 58[a], as amended, 371 Mass. 908 [1977]) was not entered until May 1, 1991. Klug's notice of appeal was filed on April 30, 1991, one day before entry of judgment on a separate piece of paper.

In urging that Klug's notice of appeal was filed fatally out of time, the plaintiffs rely heavily on Mass.R.A.P. 4(a), as amended, 393 Mass. 1239 (1985), as explicated in *Anthony* v. *Anthony*, 21 Mass. App. Ct. 299, 300-303 (1985), and *Blackburn* v. *Blackburn*, 22 Mass. App. Ct. 633, 634-635 (1986). That portion of rule 4(a), however, which can render a notice of appeal premature applies specifically to motions notwithstanding the verdict,[7] motions to amend or make additional findings,[8] motions to amend or alter the judgment,[9] and motions for a new trial.[10] Any motion of that kind has the potential for altering the judgment, and it is for that reason that a notice of appeal filed before disposition of such a motion is, as the rule says, of "no effect." "There was little point in having an appeal work its way up the ladder from a judgment which might be altered." *Anthony* v. *Anthony*, 21 Mass. App. Ct. at 301.

Such is not the case here. No motion had been filed to alter the judgment, and the belated entry of the final judgment, in violation of the rules, was a purely mechanical failing by the court clerk. Klug's counsel could reasonably con-

[7]Mass.R.Civ.P. 50(b), 365 Mass. 814 (1974).
[8]Mass.R.Civ.P. 52(b), 365 Mass. 817 (1974).
[9]Mass.R.Civ.P. 59, 365 Mass. 827 (1974).
[10]Mass.R.Civ.P. 59, 365 Mass. 827 (1974).

clude, since the judge's findings and order for judgment were complete, and since the mechanical step of entry of judgment the following morning was mandatory, that the case was ripe for the preliminary step of claiming an appeal. The entry of a final judgment on a separate piece of paper as an invariable precondition for maintaining an appeal has lost its force in light of the opinions in *Lewis* v. *Emerson*, 391 Mass. 517, 520 (1984), and *Selectmen of Braintree*, v. *County Commrs. of Norfolk*, 399 Mass. 507, 508 (1987). Compare, e.g., the older *Bevel-Fold, Inc.* v. *Bose Corp.*, 9 Mass. App. Ct. 576, 580 (1980).

2. *Denial of Klug's motion to amend his counterclaim.* In response to the summary process action by the plaintiffs, Klug filed a timely answer (see Uniform Summary Process Rule 3 [1982]), which raised six affirmative defenses and three counterclaims. The first five affirmative defenses asserted a variety of claims (some based on Klug's activities in a neighborhood conservation project) to an extended tenancy and entitlement to longer notice of termination. A sixth averred unspecified violations of the State Sanitary Code in the cottage. The counterclaims mentioned no defect in the premises.

When the matter was tried in the District Court on August 9, 1990, Klug testified that the cottage was drafty in the winter and adverted to other minor problems. Those were resolved against him by the District Court judge who found that the owners were entitled to possession and to recovery of $3,600 for use and occupany; the judge found against Klug on his counterclaims, none of which had anything to do with defects in the premises or violations of the State Sanitary Code.

From that adverse decision, Klug timely claimed an appeal under G. L. c. 239, § 5, to the Superior Court. The District Court judge, acting in accordance with the third paragraph of § 5, ordered Klug to post an appeal bond in the sum of $5,400. Klug moved for waiver of the appeal bond, supported by an affidavit of indigency. The affidavit was remarkable because it came from the same man who just months before

had offered to buy a portion of the plaintiffs' estate. The motion to waive filing of the bond was denied, and Klug, swiftly recovered from his indigency, filed the bond.

On August 29, 1990, the case was lodged in the Superior Court. The very day the case came on for trial, February 7, 1991, Klug moved to amend his complaint by adding three counterclaims: (1) that the cottage contained conditions dangerous to his health and safety; (2) that the landlord had thereby and by other unspecified "acts or omissions" deprived the tenant of quiet enjoyment in violation of G. L. c. 186, § 14; and (3) that, by arranging to have Klug pay for his utilities, the owners had violated 105 Code Mass. Regs. §§ 410.190, 410.201, and 410.354 (1986) (dealing with the obligation of a landlord to provide heat, hot water, and utilities).

For the reason that a tenant at sufference was not entitled to raise defenses and counterclaims authorized under G. L. c. 239, § 8A, the Superior Court judge denied the motion to amend.[11] We are of opinion that the judge was right in not permitting the defendant to amend his answer by adding new counterclaims, although we arrive at that conclusion for different reasons. A correct decision may be sustained on appeal on any sound ground, even if not articulated by the trial judge as the basis for decision. *Bond Bros.* v. *Robinson*, 393 Mass. 546, 552 (1984). *Doeblin* v. *Tinkham Dev. Corp.*, 7 Mass. App. Ct. 720, 722 (1979).

On the basis of the evidence, the judge found that such physical defects as existed were minor and did not materially affect the health, safety, or well-being of the occupant. "On the whole," the judge wrote, "the premises are an attractive cottage in good condition located in a very appealing setting." The plaintiffs, the judge decided, were entitled to immediate possession and damages of $10,500 for use and occupancy.[12]

---

[11]The judge announced his denial of the motion to amend only after hearing evidence as if the subjects in the added counterclaim were open.

[12]The Superior Court judge ordered an appeal bond of $10,500. Again, Klug presented an affidavit of indigency in support of a motion to waive

In view of the notice to quit sent to Klug by the plaintiffs (not to mention the series of such notices sent by their predecessor in title), the status of Klug in the cottage was that of a tenant at sufferance. *Margosian* v. *Markarian,* 288 Mass. 197 (1934). Hall, Massachusetts Law of Landlord & Tenant § 192 (4th ed. 1949). His tenancy at will had been terminated. As the Superior Court judge read G. L. c. 239, § 8A, the rights afforded under it to persons occupying premises for dwelling purposes were not available to a tenant at sufferance. That statute, as well as the provisions of G. L. c. 186, § 14, and regulations thereunder, is directed to the rights of tenants, and the judge reasoned that, logically, such rights could not be exercised by a person whose status as a tenant had lawfully been terminated.

In addition to having the attraction of logic, the judge's analysis came to grips with the paradox of a person claiming damages arising out of an occupancy that the property owner had at all times resisted as unlawful and was trying to end. That paradox, as the judge observed in his findings, was richly illustrated by Klug's claim to be reimbursed for his expenditures for heat, hot water, and utilities. "The claim is at least ironic, if not perverse," the judge wrote. "The tenant at sufferance, holding over without right, claims that, because the landowners did not enter into a 'written letting agreement' with him, he is entitled not only to the *availability* of utilities (which might be conceded to him as his entitlement as a matter of health and safety regulation) but moreover, what he precisely claims, to be given them *at the plaintiffs' expense.*" (Emphasis in original.) The judge also took note that the legislative history of G. L. c. 239, § 8A, suggested that its purpose was to enable tenants to withhold rent for premises which violated standards of fitness for habitation.[13]

___

the appeal bond. Again, when the motion was denied, Klug promptly produced the necessary bond.

[13]The judge reasonably drew inferences about the purposes of § 8A from the captions of various amendments to the statute over time: St. 1973, c. 471 ("An Act further regulating the withholding of rent for premises in violation of certain standards of fitness for habitation"); St. 1974, c. 269

Nevertheless, a reading of G. L. c. 239, § 8A, which limits its application to tenants under a lease or tenants at will, i.e., an acknowledged tenant, does not stand up either under the statutory language or the principle that we are to construe a statute so as to uphold its utility. See *Simon* v. *Solomon*, 385 Mass. 91, 100 (1982).

At several places in the first paragraph of § 8A, the language of the statute refers to "tenant or occupant" and says that a "tenant or occupant" may raise, by defense or counterclaim, "any claim against the plaintiff relating to or arising out of such property, rental, tenancy, or occupancy." G. L. c. 239, § 8A, as appearing in St. 1977, c. 963. The insertion of occupant as an alternative to tenant causes the statute to be applicable to persons in place in a dwelling whose status may be less than a tenant — otherwise there is no point in the language, and, of course, statutory language may not be regarded as superfluous. *Devaney* v. *Watertown*, 13 Mass. App. Ct. 927, 928 (1982). Perhaps more compelling is that § 8A affords defenses to persons in circumstances "where the tenancy has been terminated without fault of the tenant or occupant." G. L. c. 239, § 8A, as appearing in St. 1977, c. 963.

Operationally, the statute would be defanged if a tenant at sufferance could not employ its machinery. All that a landlord would need do to deprive a tenant of the rights conferred by § 8A would be to dispatch a notice to quit and await the termination of the tenancy. Perhaps to avoid frustration of legislative purpose, statutes in that body of laws enacted to keep rental housing stock safe and sanitary have been applied when the status of the tenant was that of a tenant at sufferance. See *Brown* v. *Guerrier*, 390 Mass. 631,

---

("An Act relating to the burden of proof in cases involving the withholding of rent due to violations of the State Sanitary Code"); St. 1975, c. 467 ("An Act further regulating rent withholding and rent receivership procedures"); St. 1977, c. 963 ("An Act clarifying the rent withholding laws"); St. 1979, c. 198 ("An Act relative to the use of certain rental payments withheld by tenants"); St. 1981, c. 133 ("An Act making certain changes in the rent withholding law").

633-634 (1983); *Serreze* v. *YWCA of W. Mass., Inc.*, 30 Mass. App. Ct. 639, 643 (1991).

If there is to be a remedy for the paradox identified by the trial judge in the application of G. L. c. 239, § 8A, it will have to be a legislative one. This case suggests that it may be time for the Legislature to reexamine whether the defenses and counterclaims described in § 8A should be available when a landowner seeks to recover possession of premises as to which the the tenancy has lawfully been terminated and as to which there has been no prior history of complaint by tenant or occupant about violations of the implied warranty of habitability, G. L. c. 186, § 14, or the State Sanitary Code, 105 Code Mass. Regs. §§ 410.001 et seq. (1986).

As to amendments of pleadings, "[t]he expressed tendency is in favor of allowing amendments, and a motion to amend should be allowed unless some good reason appears for denying it." *Castellucci* v. *United States Fid. & Guar. Co.*, 372 Mass. 288, 289 (1977). Compare *Murphy* v. *I.S.K.Con. of New England, Inc.*, 409 Mass. 842, 864 (1991); *Bengar* v. *Clark Equip. Co.*, 24 Mass. App. Ct. 41, 42-43 (1987), *S.C.*, 401 Mass. 554 (1988).

In this case, there were not merely good, but excellent, reasons for denying the defendant's motion to amend the answer and counterclaim. To begin with, the liberal attitude toward amendment of pleadings is tempered by the explicit goal stated in Uniform Summary Process Rule 1 (1980) that the summary process procedure shall "secure the just, speedy, and inexpensive determination of every summary process action." The Commentary to Rule 1 emphasizes that "time is of the essence" in eviction cases because "real estate constitutes unique property and that . . . time lost in regaining it from a party in illegal possession can represent an irreplaceable loss to the owner."

Under Uniform Summary Process Rule 5 (1980), the right to a counterclaim shall be deemed waived if such claim is not filed with the answer, unless the court shall otherwise order for good cause shown. The answer is due no later than the Monday before the trial date (Uniform Summary Process

Rule 3), and the trial date is the second Thursday following the Monday on which the case is entered (Uniform Summary Process Rule 2[c]). It is evident that the design of the rules is to bring the case to trial within a prescribed period. That objective is defeated if the pleadings are susceptible of late amendments which alter the agenda of the trial.

In his initial answer and throughout the bench trial in the District Court, Klug, who was represented by competent counsel, made three counterclaims: that the plaintiffs had engaged in unfair and deceptive practices in violation of G. L. c. 93A; that the plaintiffs had "severely interfered" with his quiet enjoyment; and, finally, that the plaintiffs had trespassed upon and destroyed his garden. The sole mention of sanitary code violations in the District Court was not as a counterclaim but as the last of six affirmative defenses, without any breath of what those violations might be. It appears that this affirmative defense was added without particularized grievance but as a catchall into which something, with luck, might fall. Nothing did.

Certainly insofar as damages were claimed, the amended answer and counterclaim offered in the Superior Court raised wholly new issues. What we may refer to generically as the utilities claims were also wholly new, as were the claims of breach of warranty of habitability regarding an exterior bedroom wall, holes and cracks in plaster in the bedroom, and loose plaster in the living room ceiling. The motion to add the counterclaims was made on the day of the Superior Court trial, more than five months after Klug's claim of a trial in Superior Court.

In order for the property owners to respond, it would have been necessary, among other things, to have experts inspect the cottage, obtain estimates of what, if any, damages were incurred by Klug, and to inquire of suppliers of utilities about their written arrangements with Klug, which might constitute evidence of agreement by Klug to pay those charges, and to inquire whether his utility costs, added to his rent, placed the occupancy cost for the cottage within fair

rental value. The proposed amendment injected trial by ambush into what were then already protracted proceedings.

Reasons justifying denial of a motion to amend include "undue delay, bad faith or dilatory motive," undue prejudice to the opposing party, *Castellucci* v. *United States Fid. & Guar. Co.*, 372 Mass. at 289-290, and imminence of trial or the introduction of entirely new theories of liability. *Goulet* v. *Whitin Mach. Works, Inc.*, 399 Mass. 547, 552 (1987). *Hall* v. *Horizon House Microwave, Inc.*, 24 Mass. App. Ct. 84, 88-89 (1987). All those reasons for denying the motion to amend were present in varying degrees. Klug's bad faith and dilatory motives were particularly apparent. For months he had been effusive about his love for the cottage and about how much he had put into it to make it liveable; how much he wanted to continue to live there. Never had he complained about the condition of the cottage or the terms, which he tried so assiduously to extend, on which he had occupied it.

Throughout this case, Klug has attempted to manipulate the summary process procedure and has misused statutory and regulatory protections for tenants in rental housing. A freestanding cottage on a suburban estate, it may safely be assumed, was not the concern of the Legislature when it authorized certain private initiatives by which tenants might serve a public interest in maintaining housing stock in the State in a safe and sanitary condition. See *Brown* v. *Guerrier*, 390 Mass. at 634.

To effectuate the intent that summary process be expeditious and to deter dilatory manipulation of summary process procedure, we are of opinion that parties generally should be limited, upon appeal to the Superior Court under G. L. c. 239, § 5, to the defenses and counterclaims asserted in the District Court or Housing Court. Good cause, such as, for example, the unavailability of any legal advice at the first level of summary process proceedings, may warrant a departure from the norm of denying amendment at the second level in the Superior Court.

For the reason of its untimeliness, we concur in the denial by the Superior Court judge of the defendant's motion to amend.[14]

3. *Request of the plaintiffs for legal costs and fees.* On the ground that Klug's appeal was patently frivolous, the plaintiffs have asked for an award under Mass.R.A.P. 25, as amended, 378 Mass. 925 (1979), of double costs and counsel fees incident to the appeal. See *Allen* v. *Batchelder*, 17 Mass. App. Ct. 453, 458 (1984). Had the appeal been limited to an attack on the Superior Court judge's findings of fact (adverse to Klug) or his exercise of discretion in denying Klug's motion to amend his answer, the appeal might well fall into the category of one as to which the law is settled and there was no reasonable expectation of a reversal. *Ibid.* Whether, however, G. L. c. 239, § 8A, was simply inapplicable to tenants at sufferance, as the judge had ruled, was a question worthy of appellate consideration, with ramifications beyond this particular dispute. We, therefore, deny the request for an award under Mass.R.A.P. 25.

Although the appeal is not frivolous, Klug's campaign, aided by counsel, represents an unfortunate distortion of laws promulgated primarily to govern conventional apartment tenancies. If it was not obvious to Klug (although the record suggests it was), his lawyers (there were four, of whom the most unrestrained in manipulating the statutory scheme was the lawyer who handled the case in the Superior Court and is the primary lawyer on appeal) must surely have appreciated that the owner of a residential property such as this one was entitled to end an informal arrangement for the occupation of an outbuilding, and that the case would end in a judgment so providing. We consider it fair to ask whether assisting a

---

[14]It is, therefore, not necessary for us to decide the questions raised by the counterclaims. Were we to do so we would have no difficulty in affirming the judge's findings that any physical defects in the cottage were insubstantial. The judge took a view; there is support in the record for his findings, and, of course, we accept such findings unless clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). Concerning the utilities, the longstanding arrangement, on principles of laches, if no other, presents a limiting case to *Young* v. *Patukonis*, 24 Mass. App. Ct. 907 (1987).

client in raising opportunistic defenses and making highly doubtful claims of indigence which cause great expense and emotional hardship (we have in mind the desire by Ruettger-Cruciana to minister to her ill father) to the opposing parties is consistent with professional responsibility. Cf. Mass.R.Civ.P. 11(a), 365 Mass. 753 (1974).

The judgment is affirmed. We affirm the entire judgment, including that portion which relates to possession, because we have received no notification of his departure from Klug and we are, therefore, not certain that he has given up his claims against the property.

*So ordered.*

BROWN, J. (concurring). I am repeating myself, but "there must be ethical as well as professional limits on how far a lawyer should go in attempting to [press] a hopeless [case]. This time it appears that counsel has gone too far" (citation omitted). *Edinburg* v. *Massachusetts Mut. Life Ins. Co.*, 22 Mass. App. Ct. 923, 925-926 (1986), (Brown, J., concurring). The majority is too kind in its characterization of the conduct of the tenant's counsel as "overweening." I would use more blunt terms: unprofessional and unethical.[1]

I fail to see how any truly professional and ethical lawyer could, in good conscience, have pressed this case through two trial courts and one appellate forum. Klug's Superior Court counsel's "conduct constituted both an affront to the court's dignity and a perversion of the court's purposes as an institution for just resolution of legitimate disputes." *Miaskiewicz* v. *Commonwealth*, 380 Mass. 153, 158 (1980). See S.J.C. Rule 3:07, Canon 1, DR 1-102(A)(5), 382 Mass. 770 (1981). Not to condemn this sort of conduct, as a consequence of which "the very temple of justice has been defiled," *Universal Oil Prod. Co.* v. *Root Ref. Co.*, 328 U.S.

[1]On the face of the record, it is fair to infer that Klug's counsel may have, among other things, participated in a fraud upon the court and, possibly, subornation of perjury.

575, 580 (1946) (Frankfurter, J.), does a disservice to the bench, the bar, and the public.

In my view, the imposition of sanctions appears to be appropriate here for counsel's filing of smokescreen counterclaims and for counsel's apparent acquiescence in the filing of bogus indigency affidavits.[2] See S.J.C. Rule 3:07, Canon 1, DR 7-102(A)(2), 382 Mass. 785 (1981). See also Mass.R.Civ.P. 11(a), 365 Mass. 753 (1974).

The absurd notion of a lawyer as a hired gun, who will do *anything* a client requests, has never had a place in our profession and must not be tolerated. See S.J.C. Rule 3:07, Canon 7, DR 7-102(A)(1) & (7), 382 Mass. 785 (1981).

Cases such as this one make manifest the need for greater emphasis on attorneys' professional responsibility and for a more certain threat of sanctions for improper conduct, such as is embodied in Fed.R.Civ.P. 11(a), as amended (1987). In any event, I believe our rule 11(a) confers upon the courts the power (if, indeed, such power is not inherent) to sanction attorneys who flagrantly disregard or abuse this responsibility. An appropriate motion for sanctions should be filed in the trial court.

---

[2] In these circumstances, the Board of Bar Overseers is obligated to review this matter.