## BEVEL-FOLD, INCORPORATED vs. BOSE CORPORATION.

Essex. February 21, 1980. — April 15, 1980.

Present: GREANEY, PERRETTA, & KASS, JJ.

*Practice, Civil,* Appeal. *Sale,* Acceptance of goods, Rejection of goods, Revocation of acceptance.

The entry of a judge's "Findings and Order," which stated "upon the filing of a motion [by the plaintiff] to add a count for goods sold and delivered . . . such motion is to be allowed and judgment entered for the Plaintiff" did not constitute an effective entry of judgment under Mass.R.Civ.P. 58(a). [578-580]

In an action by the seller of specially manufactured stereo speaker cabinets to recover the price of a number of cabinets delivered to the buyer under an instalment contract, a master's subsidiary findings did not warrant his conclusion that the buyer had not properly rejected those cabinets in which the defects were substantial and not curable. [580-584]

The buyer of specially manufactured goods under an instalment contract was entitled to recover transportation and storage charges incurred in disposing of defective goods which it had properly rejected. [584]

CONTRACT. Writ in the Superior Court dated March 9, 1973.

The action was heard by *Banks,* J., a District Court judge sitting under statutory authority, on a master's report.

Entry of judgment was ordered by *Rutledge,* J.

*John O. Mirick* for the defendant.

*Samuel J. Concemi* for the plaintiff.

GREANEY, J. This case arises out of an instalment contract under the Uniform Commercial Code for the sale of specially manufactured stereo speaker cabinets. Bevel-Fold, Incorporated (the seller), by its amended complaint sought to recover the price of 852 cabinets delivered to Bose Corporation (the buyer). Bose defended on the ground that it had rightfully rejected those cabinets, and counterclaimed

for its expenses in holding and disposing of the goods and for other damages in connection with the seller's breach. A master concluded that the buyer had not properly rejected the goods, computed the unpaid price at $8,954.67, and found for the seller on the buyer's counterclaim. The report was adopted,[1] and a judgment reflecting the master's general findings was ultimately entered. The report contains all of the subsidiary findings upon which its general findings are based (*Bills* v. *Nunno*, 4 Mass. App. Ct. 279, 283 [1976]) and incorporates the sale contract. The evidence is not reported. In this posture, the master's subsidiary findings are binding upon us unless they are mutually inconsistent, contradictory or vitiated in view of the controlling law. *Michelson* v. *Aronson*, 4 Mass. App. Ct. 182, 190 (1976). *John F. Miller Co.* v. *George Fichera Constr. Corp.*, 7 Mass. App. Ct. 494, 495 (1979). However, we are not bound by the master's general findings. Rather, we are to take the subsidiary findings together with the inferences that ought to be drawn from them and reach our own conclusions (*Bills* v. *Nunno, supra* at 283-284, and cases cited), including conclusions independent of those of the master as to the interpretation and legal effect of the contract. *D. Federico Co.* v. *New Bedford Redev. Authy., ante* 141, 143 (1980), and cases cited. We have concluded that the judgment must be reversed because the buyer properly rejected, or revoked its acceptance of, the goods.[2]

The background facts are these. Bose manufactures high quality stereo speaker systems with certain unique patented

---

[1] Although the order of reference is not reproduced in the appendix, it appears to have been a jury action order of reference in the form set forth in Rule 49(2) of the Superior Court (1974). Mass.R.Civ.P. 53(e) (3), 365 Mass. 820 (1974). After the report was filed, both parties waived their jury claims and stipulated that the report would be treated as a non-jury report under Mass.R.Civ.P. 53(e) (2), 365 Mass. 820 (1974) and Rule 49(7) of the Superior Court, as amended effective May 8, 1976.

[2] The master was unable to determine whether Bose's actions constituted a rejection or revocation of acceptance of the 852 cabinets. In the view we take of this case, the buyer acted in a commercially reasonable manner in either event (see discussion in part 2 of this opinion).

features. Its units are kept competitively priced by the use
of vinyl covered particle board in place of wood in the cab-
inets. Stringent quality control standards are exercised to
insure that the finished speaker systems remain airtight and
of good acoustical quality. The seller went into business
principally to manufacture cabinets for the buyer. A con-
tract written on Bose's order form committed Bevel-Fold
specially to manufacture from Bose's plans 10,000 of Bose's
model 501 cabinets. In the agreement Bose reserved the
right to reject cabinets defective in material or workman-
ship "at anytime" (*Cleary* v. *Barlow*, 252 Mass. 101, 104
[1925]; *Axion Corp.* v. *G.D.C. Leasing Corp.*, 359 Mass.
474, 479 [1971]), and the buyer's acceptance of the cabinets
was understood by the seller to be predicated upon the
goods' undergoing two inspections: (a) an inspection of ten
percent of the units as they were delivered (presumably to
detect visual defects), and (b) an inspection for conformity
to Bose's quality standards after the units had been processed
through the production line. Manufacture and shipment of
cabinets averaged 200 units per week between April 17 and
October 14, 1972. At the end of October Bevel-Fold went
out of business for reasons unconnected with the Bose con-
tract. The first two shipments of cabinets failed inspection
and were returned to the seller. Between March and August
there were defects in the units that were cured in most in-
stances by Bose's making repairs on its production line and
backcharging Bevel-Fold. By the end of August, the quality
of the cabinets had "lessened to a substantial extent," and in
the middle of September, a number of cabinets were reject-
ed, returned to the seller, repaired and redelivered to the
buyer. When Bevel-Fold ceased business, Bose inspected all
the cabinets remaining in its inventory, retained 788 as con-
forming or conformable, and returned 852 cabinets to the
seller. Bevel-Fold refused to accept the return of the goods,
and they were ultimately sold by Bose at a public sale.

1. *Timeliness of the appeal.* Before considering the
rights of the parties under the Uniform Commercial Code,
we first take up whether Bose noticed its appeal in a timely

manner.  On March 31, 1978, the clerk's office in the Superior Court in Essex County entered the judge's "Findings and Order," adopting the master's report, which stated "upon the filing of a motion [by the plaintiff] to add a count for goods sold and delivered[3] . . . such motion is to be allowed and judgment entered for the Plaintiff . . . ."  On April 14, 1978, the plaintiff's motion to amend its complaint to add a new count was filed, together with its affidavit of costs.  On April 18, 1978, counsel for the defendant wrote to the clerk stating that his client opposed the taxation of costs and stated "[a]fter the motion [to amend] has been allowed and judgment has been entered, kindly send me notice of entry of judgment so that my client may determine whether to appeal from the judgment."  On June 27, 1978, counsel for the defendant again wrote to the clerk, stating that "I have not received any notice from the Court that final judgment has entered or that the motion of Bevel-Fold to amend its Complaint has been allowed."  The letter again requested that the defendant be notified of the entry of final judgment.  On August 7, 1978, the clerk wrote to plaintiff's counsel that "judgment entered in this matter subject to assessment of costs by virtue of the order of March 31, 1978."  On August 22, 1978, the clerk's office issued an execution.  On August 23, 1978, the defendant docketed an appeal.  On August 31, 1978, the defendant moved for relief from the "judgment" under Mass.R.Civ.P. 60(b), 365 Mass. 828 (1974).  On November 1, 1978, a Superior Court judge, without acting on the defendant's rule 60 motion, found that judgment had never properly entered.  He ordered the execution to be superseded and directed the clerk to prepare, sign and enter an appropriate judgment.  The action by the judge was appropriate and correct.  That judgment was entered on November 16, 1978, and the defendant claimed its appeal therefrom on November 28, 1978.

---

[3] Under the provisions of the Uniform Commercial Code, the count was in actuality an "action for the price."  G. L. c. 106, § 2-709.

It is manifest that judgment in the form expressly required by Mass.R.Civ.P. 58(a), as amended, 371 Mass. 908 (1976), was never entered until November 16, 1978. Rule 58(a) provides that: "Every judgment shall be set forth on a separate document . . . . A judgment is effective only when so set forth or filed and when entered as provided in Rule 79(a)." The cases indisputably establish that both conditions set forth in the rule must be met before an appealable "judgment" exists. *Tisei* v. *Building Inspector of Marlborough*, 5 Mass. App. Ct. 328, 330 (1977). *Levy* v. *Bendetson*, 6 Mass. App. Ct. 558, 560-561 (1978). *Harrow* v. *Board of Appeals of Pittsfield*, 7 Mass. App. Ct. 937 (1979). *United States* v. *Indrelunas*, 411 U.S. 216 (1973). Smith & Zobel, Rules Practice §§ 58.5, 58.6 (1977). The "order" of the judge entered on March 31, 1978, expressly contemplated the preparation and entry of a separate judgment by the clerk in keeping with the requirements of rule 58(a). It did not constitute an effective entry of judgment under the rule. Bose's appeal was taken in a timely manner from the proper judgment that was entered on November 16, 1978.

2. *Acceptance and rejection.* The contract provided for delivery according to the buyer's schedule, obligated the seller not to anticipate that schedule, and gave Bose acceptance rights as to each delivery. These terms required "the delivery of goods in separate lots to be separately accepted" and rendered the agreement an instalment contract under G. L. c. 106, § 2-612(1). Bevel-Fold knew that the buyer required "accurate conformity in quality as a condition to the right to · acceptance" (Comment 4 to § 2-612 of the Uniform Commercial Code, 1A U.L.A. [Master ed. 1976]), that the goods would undergo two separate inspections, the last a rigid quality control inspection at the end of the buyer's manufacturing process, and that Bose's "acceptance followed the production line inspection." The delay of acceptance (and with it the concomitant right of the buyer to reject) until Bose's manufacturing process and postmanufacturing quality testing had been completed ran contrary to the usual rule that

acceptance occurs when the buyer does any act inconsistent with the seller's ownership of the goods (G. L. c. 106, § 2-606[1] [c]) — an event which certainly occurs when the buyer has taken the seller's unfinished goods and manufactured them into a new product. See *United States* v. *Crawford*, 443 F.2d 611, 613 (5th Cir. 1971); *Cervitor Kitchens, Inc.* v. *Chapman*, 82 Wash. 2d 673, 676 (1973); *Haken* v. *Scheffler*, 24 Mich. App. 196, 199-200 (1970); *Ace Chemical Corp.* v. *Atomic Paint Co.*, 31 N.C. App. 221, 223 (1976). As a result of this unusually lengthy period for acceptance, the parties developed a course of performance (G. L. c. 106, § 2-208) whereby Bose would remedy minor or trivial defects in the cabinets with debits against the price but would reserve its rights as to goods involving substantial defects which could not be cured at its facilities and which the seller was unable or refused to cure. Thus, in the early stages of performance, neither party treated nonconforming deliveries as substantially impairing the value of the whole contract so as to constitute a breach of the whole (G. L. c. 106, § 2-612[3]), and Bose implicitly recognized as an instalment buyer that it was obliged to make reasonably minor outlays of time and money to cure insubstantial defects (Comment 5 to § 2-612[2] of the Uniform Commercial Code, 1A U.L.A. [Master ed. 1976]) but that it could look to the seller to give assurances of a cure or to "take over a cure which involves any material burden." *Ibid.*

Coming to the critical times, the master found that by the end of August, 1972, the "improvement in quality [of Bevel-Fold's goods had] . . . lessened to a substantial extent," that defects (particularly airleaks which affected acoustical quality) had "appeared in increasing numbers," and that remedying the defects "became an increasing concern to Bose . . . slowed [its] production line down and caused Bose additional labor expense." By September 15, 1972, Bose notified the seller of "100% rejection . . . [i]n the next inspection report, out of a total of 10 inspected, all 10 were rejected for airleaks." Also in September, Bose returned approximately 350 cabinets to Bevel-Fold "to be reworked and

thereafter returned" (the seller did this), and it informed the seller that "no new cabinets would be accepted until the problems with the cabinets already delivered had been resolved." Bevel-Fold delivered its final shipments of 352 cabinets on October 13 and 14, 1972, ceased business operations at the end of October, and dismissed all its production line employees.[4] These subsidiary findings by the master satisfy us that by the middle of September, 1972, the quality of goods being delivered by Bevel-Fold had reached the point where Bose could no longer correct many of the defects on its own with a corresponding price debit because repair imposed increasing material burdens on it and because, as the master also found, work space at Bose was inadequate to accomplish major repairs. The findings also indicate that many of the cabinets which underwent Bose's final inspection after the seller ceased business consisted of cabinets delivered on or after September 15, 1972, and it can be reasonably inferred from the findings that the majority of the cabinets had not been processed through the buyer's production line or reinspected after initial rejection and repair. We think that Bose's communications with Bevel-Fold and the events that occurred in September put the seller on notice that the goods delivered after August 4, 1972, were substantially nonconforming; that the buyer lacked facilities to continue to make a cure; that a cure imposed material burdens on Bose; that a breach of the whole contract was imminent (G. L. c. 106, § 2-612[3]) "because the non-conformity substantially impair[ed] the value of the whole contract" (Comment 6 to § 2-612 of the Uniform

---

[4] The master found "that neither the failure of Bevel-Fold to perform to the satisfaction of Bose prior to November 1, 1972, nor its failure to continue or to resume business thereafter, was caused or contributed to by any act or default on the part of Bose. To the contrary, I find that Bevel-Fold's difficulties were in their entirety brought about solely by the combination of the circumstances already recited, which included inexperience, part-time management, failure to develop customers additional to Bose, restriction of cash-flow resulting from the trustee process served upon Bose in the suit brought by [a Bevel-Fold creditor] and inability to meet Bose's quality requirements."

Commercial Code, 1A U.L.A. [Master ed. 1976]); and that
Bose was looking to the seller for reasonable assurances of a
cure. G. L. c. 106, § 2-508. At this juncture, it was in-
cumbent on Bevel-Fold to assure the buyer that it would at
the very least maintain facilities adequate to carry out
necessary repairs or that it would accept the return of sub-
stantially nonconforming goods. Bevel-Fold's complete
cessation of its manufacturing business terminated the con-
tract and left Bevel-Fold without production line workers. As
a result, it was also incapable of substituting conforming
goods for defective ones, remedying defects in the goods, or
providing the buyer with any reasonable assurance that
defects could be cured. After the termination, both parties
were relieved of their executory obligations under the agree-
ment and Bose, as to the stock of specially manufactured
cabinets held in its inventory (which we infer were not
susceptible to easy disposal on the market), retained its Code
remedies for nonconforming goods. G. L. c. 106, § 2-106(3).

Under these circumstances, we think that the buyer acted
in a commercially reasonable fashion in conducting a spe-
cial inspection of the remaining 1,640 cabinets in its inven-
tory. Furthermore, the master's findings that Bose retained
788 cabinets which it could repair at its own plant, together
with his professed inability to find that the remaining cabi-
nets "had been earlier inspected (and/or accepted) in the
Bose production line" and his "assumption" (without sup-
porting subsidiary findings) that the remaining 852 cabinets
could be reworked by Bose at its plant (thereby impliedly
finding that the 852 cabinets were defective), satisfies us
that the buyer did not make a dishonest rejection or one that
could have unfairly surprised the seller, but rather that it re-
tained all the cabinets it could repair at its own plant and
rejected or revoked acceptance of only those in which the
defects were substantial and not curable. See Peters, Reme-
dies for Breach of Contracts Relating to the Sale of Goods
Under the Uniform Commercial Code: A Roadmap for Ar-
ticle Two, 73 Yale L.J. 199, 225-227 (1963). Because Bevel-
Fold could no longer: (a) cure a nonconforming instalment

(G. L. c. 106, § 2-612[2]); (b) give reasonable assurances of a cure (*ibid.*); or (c) substitute a conforming delivery (G. L. c. 106, § 2-508), it is not necessary to dwell on the master's inability to determine from the evidence before him which of the cabinets remaining in Bose's inventory had been accepted prior to the attempted return of the 852 cabinets. As to any nonconforming cabinets which had been accepted on the assumption that a cure would be forthcoming, based upon the course of performance between the parties, Bose's revocation of acceptance occurred within a reasonable time. G. L. c. 106, § 2-608(2). Contrast *Akron Brick & Block Co.* v. *Moniz Engr. Co.*, 365 Mass. 92, 95 (1974). Similarly, as to cabinets which were never accepted because they had not met the required accurate conformity in quality (see Comment 4 to § 2-612 of the Uniform Commercial Code, 1A U.L.A. [Master ed. 1976]), Bose's rejection was timely. G. L. c. 106, § 2-602(1). Contrast *Axion Corp.* v. *G.D.C. Leasing Corp.*, 359 Mass. at 478-479. "[A]ll reasonable leeway is granted to the rightfully rejecting or revoking buyer" (*Pavesi* v. *Ford Motor Co.*, 155 N.J. Super. 373, 377 [1978]), and it would be contrary to the Code's rule of reasonableness to require the buyer to use or retain substantially nonconforming goods which are incapable of adequate repair. We hold that the rejection was rightful and that the master's general findings to the contrary are erroneous.

3. *The buyer's damages.* Bevel-Fold refused to accept Bose's return of the 852 cabinets. In its endeavor to return the goods, Bose incurred transportation charges and thereafter incurred storage charges for the care and custody of the goods pending their sale. Bose is entitled to recover these expenses, which total $1,864.25. G. L. c. 106, § 2-715(1). Ultimately, Bose sold the cabinets at an advertised public sale and received $656.04 for the lot. G. L. c. 106, §§ 2-711(3), 2-706. In connection with the sale, the master found that Bevel-Fold's manager failed to take any step "to protect [its] position either by way of inspection or examination of the alleged defects before the sale." See G. L. c. 106, § 2-515. There is no indication that Bose's disposition of the

goods was commercially unreasonable in any respect. The termination clause in the agreement and the provisions of G. L. c. 106, § 2-106(3), ended executory obligations between the parties. Bose has not argued to us that it is entitled to other damages in connection with its rejection of the 852 cabinets under G. L. c. 106, § 2-712, probably because the seller is out of business and is now immune as a practical matter from a judgment. In these circumstances, Bose is entitled to recover its expenses, and Bevel-Fold is entitled to a credit against those expenses for the amounts received from the sale. G. L. c. 106, § 2-706(6). Comment 2 to § 2-711 of the Uniform Commercial Code, 1A U.L.A. (Master ed. 1976). See also 3A Dusenberg & King, Sales & Bulk Transfers under the Uniform Commercial Code § 14.05[4] (1978).

The judgment is reversed. A new judgment is to be entered which: (1) finds for the defendant on the plaintiff's claims and (2) finds for the defendant on its counterclaim and assesses damages against the plaintiff in the amount of $1,208.21.

*So ordered.*