**MIDWEST MOBILE DIAGNOSTIC IM-AGING, L.L.C., a Delaware Limited Liability Company, Plaintiff,**

v.

**DYNAMICS CORPORATION OF AMER-ICA, a New York corporation, d/b/a Ellis & Watts, Defendant.**

No. 4:96 CV 9.

United States District Court,
W.D. Michigan.

May 28, 1997.

David G. Crocker, Early, Lennon, Peters & Crocker, PC, Kalamazoo, MI, for Midwest Mobile Diagnostic Imaging, L.L.C.

Bruce A. Hoffman, Graydon, Head & Ritchey, Cincinnati, OH, Stephen M. Denenfeld, Lewis & Allen, Kalamazoo, MI, Harry J. Finke, IV, Graydon, Head & Ritchey, Cincinnati, OH, for Dynamics Corp. of America.

Lawrence J. Murphy, Howard & Howard, Lansing, MI, for VFM.

**1.** A mobile MRI unit is, in effect, a mobile MRI clinic. It is a semi tractor trailer which contains an MRI scanner and the computer equipment necessary to operate such a machine. It is de-

## OPINION

ENSLEN, Chief Judge.

### I. INTRODUCTION

Plaintiff Midwest Mobile Diagnostic Imagining, L.L.C. [hereinafter "MMDI"] brings this diversity action against defendant Ellis & Watts, d/b/a Dynamics Corporation of America [hereinafter "E&W"], seeking damages for 1) breach of a sales contract for the purchase of four mobile MRI units [1] and 2) misrepresentation. Defendant, the seller, counterclaims for damages, alleging that the buyer is in breach. Having considered the evidence submitted and the legal arguments of the parties made during a three-day bench trial, and having reviewed the exhibits submitted, the Court enters the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). To the extent that any findings of fact also constitute conclusions of law or *vice versa*, they are so adopted.

### II. THE RECORD

Plaintiff MMDI offered the following six witnesses: Gerald Turowski, Service Manager for MMDI; Azzam Kanaan, Executive Director of MMDI; Paul Koss, formerly Service Engineer for Philips Medical Systems [hereinafter "Philips"], presently Service Engineer for MMDI; Ilydio Polachini, Jr., Director of Imaging at MMDI; Robert Freudenberger, Director of Medical Sales at E&W; Andrew Pike, President of E&W; and John Getz, Director of Mobile Imaging at E&W. Defendant called three witnesses: Robert Freudenberger; Rick Goldsberry, Senior Projects Engineer at E&W; and John Getz. The parties submitted 58 documentary exhibits jointly and defendant submitted the deposition testimony of Wim Cense, Director of Mobile Engineering at Philips, separately.

### III. CONTENTIONS OF THE PARTIES

MMDI contends that, after its rightful rejection of a nonconforming trailer tendered by E&W on December 13, 1995, E&W repudiated the contract in its entirety. E&W's

signed to function as a temporary extension of the hospital which it is serving, with an interior which generally matches the hospital environment.

repudiation whether anticipatory or not, destroyed whatever right to cure E & W may have had and gave MMDI the right to cancel the contract, which it then did. Having rightfully canceled the contract, MMDI argues it is entitled to damages.

E&W counters that its tender on December 13, 1995 was both timely and in conformity with contract specifications. Consequently, MMDI's rejection was wrongful. E&W continues that, even if the trailer were not conforming, E&W had a right to cure pursuant to Uniform Commercial Code [hereinafter "UCC"] § 2–508,[2] and MMDI could not cancel the contract without first requesting adequate assurances from E&W in writing pursuant to UCC § 2–609. Since plaintiff did not satisfy § 2–609 and a reasonable time for performance had not expired, MMDI's cancellation of the contract on December 18, 1995 constituted anticipatory repudiation.

## IV. FACTS

Plaintiff Midwest Mobile Diagnostic Imaging, L.L.C. ("MMDI") is a Delaware limited liability company, with offices in Kalamazoo, Michigan, engaged in the business of furnishing equipment and personnel for magnetic resonance imaging (MRI) scans to hospitals in southwestern Michigan. In 1995, MMDI had three mobile MRI units servicing area facilities.

Defendant Ellis & Watts ("E&W") is a New York corporation whose principal place of business is in Cincinnati, Ohio, which engineers, designs, and manufactures trailers for mobile medical uses, including mobile MRI systems.

Under Michigan regulations, the number of mobile MRI scanners which may be licensed is strictly limited. Consequently, companies wishing to provide this service must seek a Certificate of Need from the State. In 1995, the demand for these mobile MRI units exceeded that which MMDI could supply. MMDI, therefore, sought and received a Certificate of Need to begin operating a fourth mobile MRI unit.

In April 1995, plaintiff commenced negotiations with defendant to purchase four mobile MRI trailers, each designed to house a state-of-the-art, ACS NT 1.5T MR scanner system, which plaintiff would purchase separately from Philips. During these initial negotiations, E&W became aware that MMDI had an immediate need for the first trailer because of the growing demand for its services.

As a consequence, the parties agreed that delivery of the first trailer would occur in September 1995 with the rest to follow in monthly installments. However, during final negotiations in Kalamazoo on August 10, 1995, the parties agreed to delete a clause in the written contract requiring that all four trailers be delivered in 1995. While no specific delivery dates were ultimately included in the written contract, E&W understood that early delivery of the first trailer was of great importance to MMDI. At the time of signing, the parties expected delivery of the trailers to occur in October, November, December, 1995 and January, 1996. The delivery dates were, however, contingent upon coordination with Philips and agreement of the parties.

In addition to the timing of the project, during negotiations the parties also made representations concerning the design of the trailer. On April 17, 1995, Robert Freudenberger of E&W, faxed a signed purchase agreement to Jerry Turowski of MMDI. Attached to the form contract were two drawings. One of the drawings depicted a three-dimensional illustration of the interior of a mobile MRI system trailer upon which was written: "Spacious, efficient layout with clean, aesthetically pleasing interior." (Exh. 2.) In addition, these drawings, and all others reviewed by MMDI both before and after contract signing, did not depict a bracing structure surrounding the scanner magnet.

On August 10, 1995, Mr. Turowski and Mr. Freudenberger executed a purchase agreement for four E&W trailers. (Exh. 9.) With the signing of the contract, MMDI paid E&W a deposit in the amount of $63,000. On August 11, 1995, Mr. Andrew Pike, President of E&W, countersigned the purchase agreement in Cincinnati, Ohio. Under the parties' agreement, E&W was to construct

---

**2.** See note 4, *infra.*

the four trailers in accordance with Philips' specifications. Once certified by Philips, the trailers could be delivered. (Exh. 9, ¶ 3.)

On September 7, 1995, plaintiff and defendant met in Kalamazoo to discuss the delivery schedule. On September 21, 1995, MMDI sent a letter indicating that, as a result of that meeting, MMDI expected delivery of the first trailer on November 6, 1995. The letter also noted the parties' understanding that the trailer would be "show" ready for MMDI's open house in Kalamazoo, Michigan, on November 3, 1995. E&W did not respond to this letter. During the course of construction, the parties discussed several alterations to the trailer and consequently, again renegotiated the delivery date for the first trailer. Ultimately, the parties agreed upon a December 1, 1995 delivery date. Under the expectation that the trailer would be delivered on that date, MMDI scheduled patients assuming the trailer would be ready for use beginning December 4, 1995.

On November 3, 1995, indicating that the trailer was cosmetically complete, E&W presented the trailer to MMDI to show at its open house in Kalamazoo, during which representatives of MMDI and many of its customers, inspected the trailer. At that time, the scanner magnet was free from any metal, bracing structures. The trailer was then returned to E&W for final adjustments and testing.

As of mid-November 1995, the first E&W trailer was fully fabricated and substantially all equipment was installed and ready for testing by Philips. In anticipation of the December 1 delivery date, E&W invoiced MMDI on November 10, 1995 for the full purchase price of the first trailer. (Exh. 20.) On November 16, 1995, E&W sent a followup letter requesting payment prior to shipment of the trailer on November 30 in accordance with the purchase agreement. (Exh. 9, 22.) MMDI paid $321,500 to E&W on November 17, 1995. (Exh. 20.)

On November 28, 1995, the first trailer failed to meet contract specifications in a test conducted by Philips. The test indicated that the trailer did not comply with Philips' specifications for magnetic shielding in the sidewalls of the trailer. This failure occurred despite the fact that, throughout the construction of the trailer, Philips had repeatedly noted the importance of the proper fabrication of this feature in its correspondence with E&W. (Exhs.13, 17, 19.)

When the parties discovered that the trailer had failed the test, they met to discuss potential solutions to the situation. At that time, E&W stated unequivocally that: 1) the trailer was defective; 2) the defect was entirely its fault and responsibility; and 3) it would cure the problem. E&W also indicated a willingness to reimburse MMDI for at least part of the expenses it might incur in renting another trailer to substitute for the one that E&W had not completed. As a result of the need for a cure, E&W failed to tender a conforming trailer on the December 1 delivery date and MMDI was forced to cancel appointments which had been scheduled with patients for December 4, 1995.

During the following two weeks, E&W designed a reinforcement structure to contend with the wall-flexing problem. The solution consisted of multiple, large, steel beams placed around the scanner magnet in a cage-like structure which prevented removal of the magnet's outer covers and dramatically changed its appearance. Such a bracing structure had never been used with a mobile MRI scanner by any manufacturer. During this period, E&W exchanged multiple letters and sketches with Philips in which Philips' representatives indicated several concerns with the bracing structure. E&W made adjustments to address some of these concerns. Ultimately, Philips approved the design as a temporary solution to the wall-flexing problem.

On December 7, 1995, E&W sent MMDI a schedule indicating that the decision whether to proceed with this design would be made on December 12, 1995. The letter indicated: "if no go at this point, alternate plans established." Although MMDI had reviewed drawings of the interior during the course of construction, E&W did not include a sketch of the reinforcement design in this correspondence.

On December 12, 1995, Philips' representatives retested the trailer with the bracing

structure in place and found that the flexing problem had been remedied. Thus, the trailer was approved for use on a temporary basis. However, because the structure impaired service of the scanner magnet, Philips would not certify the trailer for permanent use with the structure in place.

On December 13, 1995, Mr. Turowski of MMDI arrived at E&W to inspect the new design for the first time. After viewing the trailer and speaking with Philips' representatives, Mr. Turowski concluded that the bracing structure was unacceptable for several reasons. Mr. Turowski and Mr. Andrew Pike of E&W then placed a telephone conference call to Dr. Azzam Kanaan and Dr. Ilydio Polachini at MMDI. At that time, Mr. Turowski indicated that, with the bracing structure, the trailer did not conform to the contract obligations because: 1) service of the scanner magnet would be impeded and, in cases, would be more dangerous; 2) its appearance was objectionable; and 3) the resale value of the trailer would be diminished.

Mr. Pike countered that the structure in place conformed to the parties' agreement, that this was the design that met the Philips' specification, that it had been approved by Philips, and told MMDI to accept it the way it was. Further, Mr. Pike stated that the materials had already been purchased to install this design in the second trailer, that this was the best design that one could come up with, and that he did not know if it could be done any differently. Finally, Mr. Pike refused to pay rent for a replacement unit or to refund MMDI's previous payment.

The following day, December 14, 1995, Mr. Pike sent a letter to Dr. Kanaan at MMDI (Exh. 29.), indicating that E&W was working with "this design" to see if it could be made more aesthetically pleasing. The letter made no reference to the servicing problems, safety concerns, or concerns about a potential diminution in resale value resulting from the use of the bracing structure. Mr. Pike again asserted the validity of the contract, and refused to refund MMDI's payment for the trailer.

On December 18, 1995, acting in good faith, MMDI advised E&W in writing that the Purchase Agreement was canceled. On December 19, 1995, MMDI rented a mobile MRI unit to replace the one it had expected to receive from E&W. On December 21, 1995, MMDI executed a contract with a third party for the manufacture and construction of two trailers to house two of the Philips 1.5T MR scanner systems.

On December 22, 1995, Mr. Freudenberger sent a letter to Mr. Turowski, reiterating that the first trailer was ready for shipment and requesting instructions on how to ship it. In addition, the letter indicated that E&W was finalizing the design for an alternative bracing structure which would neither impede the servicing of the magnet components nor negatively impact the aesthetics of the trailer interior. Mr. Freudenberger also suggested that, after final testing and seeking MMDI's input regarding the aesthetics of the design, the design "would be considered the permanent solution" for the trailer. The design would then be incorporated into the second trailer at which time the first trailer would be returned to E&W and retrofitted with the new design at no cost to MMDI. E&W, however, maintained that the purchase agreement was still effective and continued to refuse to refund MMDI's payment. Soon after this correspondence, the parties ceased communication. Ultimately, E&W did remove the offending reinforcement structure and replaced it with an alternative design which was approved for permanent use by Philips. In the time since this replacement solution was fabricated and installed, E&W has sold two of the trailers to a third party.

On January 9, 1996, MMDI filed the instant suit for damages resulting from breach of contract and misrepresentation. E&W retained payments made by MMDI in the amount of $384,500. Further, MMDI incurred expenses in the amount of $185,250 for the lease of a mobile MRI scanner and trailer between December 19, 1995 and April 20, 1996.

## V. ANALYSIS

### A. *Breach of contract*

The primary issue for resolution by the Court is whether MMDI rightfully rejected

E&W's tender of the first trailer and then subsequently canceled the contract, or if its actions in mid-December constituted anticipatory repudiation of the contract. Having previously determined that Michigan law controls in the instant case,[3] the Court simply notes that the Michigan version of the Uniform Commercial Code [hereinafter the "UCC"] applies to this sales contract. MCLA §§ 440.1101 *et seq.*[4]

### 1. Installment Contract

Before turning to the specific questions of rejection and cancellation, the Court must first resolve a threshold issue. Under the UCC, the parties' rights to reject, cure, and cancel under an installment contract differ substantially from those defined under a single delivery contract. Consequently, resolution of whether the contract is an installment contract is of primary concern. Section 2–612(1) defines an "installment contract" as "one which requires or authorizes the delivery of goods in separate lots to be separately accepted...." The commentary following this section emphasizes that the "definition of an installment contract is phrased more broadly in this Article [than in its previous incarnation as the Uniform Sales Act] so as to cover installment deliveries tacitly authorized by the circumstances or by the option of either party." § 2–612, cmt. 1.

■ Plaintiff argues that the contract between itself and E&W does not constitute an installment contract because it authorizes delivery in commercial units, and not lots, as required by subsection (1). However, upon review of the Code section defining those terms, it becomes clear that those terms are not mutually exclusive. Section 2–105 defines a "lot" as a "parcel or single article which is the subject matter of a separate sale or delivery, whether or not it is sufficient to perform the contract." The same section defines a commercial unit as "such a unit of goods as by commercial usage is a single whole for purposes of sale and division of

which materially impairs its character or value on the market or in use. A commercial unit may be a single article (as a machine) or a set of articles (as a suite of furniture or an assortment of sizes) or a quantity (as a bale, gross, or carload) or any other unit treated in use or in the relevant market as a single whole." Thus, a lot, which is the measure of goods that the contract states will be delivered together in one installment, can be a single commercial unit. Consequently, § 2–612 applies wherever a contract for multiple items authorizes the delivery of the items in separate groups at different times, whether or not the installment constitutes a commercial unit.

■ The contract between MMDI and E&W for the sale of four trailers authorizes the delivery of each trailer separately. While the written contract does not explicitly state this delivery schedule, it does authorize separate delivery. Paragraph 2 of the contract assumes separate delivery dates by setting out a payment schedule wherein the balance for *each* unit is due at the time of shipment. Furthermore, based on the parties' testimony it is clear that both parties understood the trailers would be delivered in separate installments. Indeed, neither party disputes that they agreed to have the trailers delivered at four separate times. Therefore, the Court finds that the contract in dispute is an installment contract.

### 2. Right of Rejection

■ Section 2–612, therefore, is the starting point for the Court's analysis of MMDI's actions on December 13, 1995. *Neufer v. Video Greetings, Inc.,* 931 F.2d 56, No. 90–3272, 1991 WL 65439, *4 (6th Cir. 1991) (unpublished). Under § 2–612, the buyer's right to reject is far more limited than the corresponding fight to reject under a single delivery contract defined under § 2–601. Under § 2–601, a buyer has the right to reject, "if the goods or tender of delivery

---

3. At the commencement of trial, the Court ruled on the choice of law issue from the bench. Since the details of that decision appear within the record, they will not be reviewed here.

4. All UCC sections will be referred to by their Model Code section numbers. To find the Michigan equivalent look to MCLA chapter 440. All sections under that chapter bear the same number as their Model Code counterparts. (E.g. UCC § 2–612 is equivalent to MCLA 440.2612.)

fail in any respect to conform to the contract...." Known as the "perfect tender" rule, this standard requires a very high level of conformity. Under this rule, the buyer may reject a seller's tender for any trivial defect, whether it be in the quality of the goods, the timing of performance, or the manner of delivery.[5] To avoid injustice, the Code limits the buyer's correlative right to cancel the contract upon such rejection by providing a right to cure under § 2–508. § 2–508, cmt. 2. Under § 2–508, the seller has a right to cure if s/he seasonably notifies the buyer of the intent to do so, *and* either 1) the time for performance has not yet passed, or 2) the seller had reason to believe that the goods were in conformity with the contract. Thus, § 2–508's right to cure serves to temper the buyer's expansive right to reject under a single delivery contract. *Leitchfield Dev. Corp. v. Clark,* 757 S.W.2d 207, 209 (Ky.App.1988) (citing *Uchitel v. F.R. Tripler & Co.,* 107 Misc.2d 310, 434 N.Y.S.2d 77 (Sup.Ct.1980))..

Section 2–612 creates an exception to the perfect tender rule. *Bodine Sewer, Inc. v. Eastern Illinois Precast, Inc.,* 143 Ill.App.3d 920, 97 Ill.Dec. 898, 904, 493 N.E.2d 705, 711 (1986). Under subsection (2), a buyer may not reject nonconforming tender unless the defect substantially impairs the value of the installment. In addition, "if the nonconformity is curable and the seller gives adequate assurances of cure," the buyer must accept the installment. § 2–612, cmt. 5. But even if rejection is proper under subsection 2, cancellation of the contract is not appropriate unless the defect substantially impairs the value of the whole contract. § 2–612(3), cmt. 6. Because this section significantly restricts the buyer's right to cancel under an installment contract, there is no corresponding necessity for reference to § 2–508; the seller's right to cure is implicitly defined by § 2–612. *Neufer,* 1991 WL 65439 at *4–*5 (unpublished) (6th Circuit reviewing rights of rejection, cure, and cancellation under § 2–612 without reference to § 2–508); *Graulich Caterer, Inc. v. Hans Holterbosch, Inc.,* 101 N.J.Super. 61, 243 A.2d 253 (1968) (same). *See* William H. Lawrence, *Appropriate Standards for a Buyer's Refusal to Keep Goods Tendered by a Seller,* 35 WM. & MARY L.REV. 1635, 1687–89 (1994).[6]

### a. Delivery Date

Before proceeding with the analysis of MMDI's December 13 rejection, the Court initially notes that E&W's tender on December 13 constituted a cure attempt for the wall-flexing defect which delayed the delivery of the first trailer beyond the agreed upon delivery date. Although under § 2–612 the delivery date does not cut off the seller's right to cure, it does have an effect on the rights of the parties. *See Graulich,* 243 A.2d at 261.

In the instant case, the original, written contract included no definite delivery date. Instead, the contract left the delivery term to be agreed upon at a later date. At the time of execution, the parties both expected delivery of the first trailer to take place in October. During the months after the execution of the contract, however, the parties modified the deadline for the first installment of the contract on several occasions. As noted above, upon review of the testimony and

---

**5.** There is some conflicting case law and commentary concerning the efficacy of the "perfect tender" rule even in the context of a single delivery contract. For discussion of this controversy, see William H. Lawrence, *Appropriate Standards for a Buyer's Refusal to Keep Goods Tendered by a Seller,* 35 WM. & MARY L.REV. 1635 (1994). Given that the "perfect tender" rule does not apply in this case, this controversy does not effect the Court's determination in any way.

**6.** Courts of other jurisdictions have reached differing conclusions with regard to the interaction between §§ 2–612 and 2–508. *See, e.g. Arkla Energy Resources v. Roye Realty & Dev., Inc.,* 9 F.3d 855 (10th Cir.1993); *Bodine,* 97 Ill.Dec. at 906, 493 N.E.2d at 713; *Bevel–Fold, Inc. v. Bose Corp.,* 9 Mass.App.Ct. 576, 402 N.E.2d 1104, 1108 (1980); *Continental Forest Prods., Inc. v. White Lumber Sales Inc.,* 256 Or. 466, 474 P.2d 1, 4 (1970). This Court does not find the arguments of these other courts persuasive, however, and notes that their decisions are not binding on this Court. Nevertheless, the Court also notes that, since the time for delivery of the first installment had already passed on December 1, 1995 (see *infra* § 2(a)) and defendant could not have reasonably believed and, in fact, did not believe that the trailer was in conformity with the contract on that date, defendant had no right to cure under § 2–508.

documentary evidence, the Court finds that, whatever delivery date the parties had agreed upon prior to November 1995, by early November they had renegotiated their agreement to establish a December 1, 1995 delivery date. *See* § 2–209 (sales contract may be modified by oral or written agreement without consideration, so long as agreement does not state otherwise).

■■■ Defendant argues, however, that, even if the parties had at one point agreed upon a December 1, 1995 deadline, when the first trailer failed the Philips road test on November 28, 1995, the parties renegotiated the delivery term to allow E&W a reasonable time to cure the defect. While E&W is correct that, as of December 1, it had a reasonable time in which to cure the wall-flexing problem, the Court disagrees that MMDI's willingness to wait for a cure constitutes an agreement to extend the delivery deadline. Because the parties believed that the defect was curable and E&W, without solicitation, unequivocally promised to cure it, under § 2–612, MMDI had no choice but to accept an offer of cure. To reject the installment on November 28 would have constituted a violation of § 2–612. The Court, therefore, finds that any negotiations the parties engaged in regarding delivery after discovery of the wall-flexing problem, did not constitute a modification of the delivery date for the first installment, but rather involved negotiation regarding cure. Since no specific date for delivery of a cure was agreed upon during those negotiations, under section 2–309(1), E&W had a reasonable time to effectuate a cure. Although there is some question as to whether further delay would have been reasonable, the Court finds that, as of December 13, 1995, a reasonable time had not yet passed. Therefore, defendant's tender of a cure was timely.[7]

7. Defendant contends that because under ¶ 3 of the purchase agreement (Exh. 9), delivery was conditioned upon certification by Philips and the condition was not yet satisfied, defendant's duty to perform had not yet arisen on December 13. The argument is unavailing, however, given that it was defendant's deficient performance that prevented certification of the trailer both in late November and mid-December 1995. *See Ken-*

### b. *Substantial Impairment of the Installment*

The Court's conclusion that E&W's December 13 tender was an attempt to cure the November 28 breach raises another question: which standard of conformity applies to cure under an installment contract, perfect tender or substantial impairment? Looking to the rationale behind § 2–612, the Court notes that the very purpose of allowing the seller time to cure under this section is to permit it additional time to meet the obligations of the contract. The assumption is that, because the parties have an ongoing relationship, the seller should be given an opportunity to make up the deficiency. This section was not designed to allow the seller to have a never-ending series of chances to bring the item into conformity with the contract. Nor was it enacted to force the buyer to accept a nonconforming product as satisfaction of the contract. Consequently, it is logical that a tender of cure should be required to meet the higher "perfect tender" standard. On its face, however, § 2–612, which generally defines a buyer's right to reject goods under an installment contract, requires only substantial impairment in this context as well. Thus, there is some question as to which is the appropriate standard. The answer is not crucial however, since the trailer in this case fails under *both* standards. Because a decision on this point will not effect the ultimate outcome in this case, the Court declines to address the issue. Instead, the Court proceeds with the substantial impairment analysis provided by § 2–612.

■■■ To establish substantial impairment of the value of an installment, the buyer " 'must present objective evidence that with respect to its own needs, the value of the goods was substantially impaired.' " *Arkla Energy Resources v. Roye Realty & Dev., Inc.,* 9 F.3d 855, 862 (10th Cir.1993)

*tucky Skilled Craft Guild v. General Electric Co.,* 431 F.2d 62, 68 (6th Cir.1970) (quoting *Gulf Oil Corp. v. American Louisiana Pipe Line Co.,* 282 F.2d 401 (6th Cir.1960)) (" 'Where liability under a contract depends upon a condition precedent one cannot avoid his liability by making the performance of the condition precedent impossible, or by preventing it.' ").

(quoting *Bodine Sewer, Inc. v. Eastern Illinois Precast, Inc.*, 143 Ill.App.3d 920, 97 Ill.Dec. 898, 906, 493 N.E.2d 705, 713 (1986)). *See also* § 2–612, cmt. 4. The existence of such nonconformity depends on the facts and circumstances of each case, and "can turn not only on the quality of the goods but also on such factors as time ..., and the like." § 2–612, cmt. 4. *See eg., Colonial Dodge, Inc. v. Miller*, 420 Mich. 452, 457–58, 362 N.W.2d 704 (1984) (holding missing spare tire in new car had special devaluing effect for the buyer and thus could constitute substantial impairment). Finally, whether nonconformity rises to the level of substantial impairment may be judged by reference to the concept of material breach under traditional contract law. *See Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349 (Minn.1978).

In the instant case, plaintiff alleges several aspects in which defendant's December 13 tender failed to conform to contract obligations. Plaintiff contends that the trailer tendered on December 13 with the bracing structure did not conform to the parties' agreement because: 1) it was not and could not be certified by Philips without conditions for use with the 1.5T scanner and 2) its interior design did not conform with the parties' agreements. Because of these defects, MMDI argues that the value of trailer was reduced substantially. Defendant, on the other hand, contends that the contract required only that the trailer meet the technical specifications provided by Philips, and that, therefore, the December 13 trailer was in complete compliance with its terms.

The written contract signed by the parties in this case is relatively skeletal and thus, requires interpretation. The Court's fundamental purpose in interpreting the terms of the contract is to give effect to the intent of the parties as it existed at the time the agreement was made. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.* 619 F.2d 1001, 1009 (3d Cir.1980); Williston, INTERPRETATION AND CONSTRUCTION OF CONTRACTS, Ch. 22, § 601. " 'The meaning of the agreement of the parties is to be determined by the language used by them and by their action, read, and interpreted in the light of commercial practices and other surrounding circumstances.' " 1 WILLISTON ON SALES § 10–2, 431 (quoting 1 CORBIN ON CONTRACTS § 2.9 (rev.Ed.)). *See also* § 1–203 (setting out the requirement of good faith and requiring the Court to interpret "contracts within the commercial context in which they are created, performed, and enforced[ ]"). Furthermore, the Code explicitly authorizes courts to look to the parties' course of dealings and performance and to the usage of terms in trade in interpreting the terms of the contract. §§ 1–205, 2–202, and 2–208.

As instructed by the commentary to § 2–612, the Court begins the substantial impairment analysis by looking to the "normal and specifically known purposes of the contract." § 2–612, cmt. 4. Reviewing the evidence presented, the Court finds that the primary purpose of the contract was to provide the plaintiff with four trailers for use with the Philips 1.5T scanner. With that in mind, the parties agreed that the trailers would be constructed in accordance with the specifications provided by Philips and that the trailer would be not be ready for delivery until Philips certification had been received.[8] Philips did not, however, ever certify the trailer for unconditional use with the bracing structure. Because the bracing structure prevented normal service of the scanner magnet, it was only approved as a temporary fix.[9]

The general rule in cases where third party approval is required as a condi-

---

8. Although the contract does not explicitly state that the trailers must be constructed in accordance with Philips' specifications, the parties have stipulated that the contract so required and the Court, therefore, begins its analysis from this premise. In addition, it is undisputed, indeed the defendant asserted repeatedly in its trial brief, that, under the contract, delivery of the trailer was conditioned upon certification of the unit by Philips.

9. Defendant argues that Philips did approve the trailer with the structure and that the testimony and documentary evidence reveal this to be so. However, review of the evidence convinces the Court that, in fact, while Philips may have approved the brace as a temporary solution to bring the wall-flexing problem within specification, it never approved the steel brace for permanent use with the Philips scanner.

tion of performance is one of strict compliance. *See generally* J. Calamari and J. Perillo, THE LAW OF CONTRACTS 399, § 11–17 (2d ed.1977). Such conditions will only be excused where the third party acts in bad faith or dishonestly. *Id.* In the instant case, there was no credible evidence presented that Philips acted in bad faith by withholding approval. On the contrary, there was extensive evidence presented detailing the inherent problems with the long-term use of such a bracing solution, which demonstrated the reasonableness of Philips' refusal to certify the trailer. The bracing structure's shape and orientation prevented removal of the outer panels from the scanner magnet and made some repairs to the magnet more difficult and more dangerous. Furthermore, in order to perform certain repairs, the steel brace would have to be unbolted and removed. Once removed, the scanner magnet would have to be recalibrated and retested. Consequently, Philips' decision to refuse certification was entirely justified. Having found no evidence of bad faith or dishonesty on the part of Philips, the Court finds that defendant's failure to meet this condition constituted a breach of the parties' agreement. *See Canderm Pharmacal v. Elder Pharm., Inc.,* 862 F.2d 597, 605 (6ᵗʰ Cir.1988) (quoting *Rockwell Int'l Corp. v. Regional Emergency Med. Servs.,* 688 F.2d 29, 31 (6th Cir.1982)) (" 'Where one party to a contract hinders or prevents the completion of a contract, this constitutes a breach of the contract.' "). Given that the central purpose of the trailer was to house a Philips 1.5T scanner, the failure to meet the standard for Philips' certification substantially impaired the value of the trailer. The Court, therefore, finds that this failure to conform to the parties' agreement, in and of itself, constituted a material breach.

■ In addition to violating the requirement that the trailer receive certification from Philips, plaintiff correctly asserts that defendant breached yet another term of the contract. The Court notes that the bracing structure also violated the parties' implied agreement regarding the design of the interior of the trailer. During the course of the parties' dealings both before and after the contract signing, MMDI reviewed numerous representations of the trailer's interior layout and design. Many of these drawings showed the location of the scanner and detailed the location of every structure in the trailer. None of them, however, depicted a cage-like brace made up of multiple, large, steel beams surrounding the scanner magnet. These drawings, when coupled with E&W's own statement that the trailer was cosmetically complete without the brace when it was presented at the open house, convince the Court that there was an implied agreement that the trailer would not have such a structure.

Furthermore, it is clear that, when the contract was executed, the parties both understood that the trailer's interior was meant to be aesthetically pleasing. It is the very nature of a mobile MRI trailer to function as an extension of the hospital it services. Since E&W was in the business of constructing trailers for mobile medical uses, it no doubt understood that the appearance of the trailer's interior could impact the comfort of MMDI's patients. Indeed, it is apparent that E&W realized such aesthetics were important to the value of the trailer, since, in its initial negotiations with MMDI, E&W included a cut-away drawing of the interior of a mobile unit which read: "Spacious, efficient layout with clean, *aesthetically pleasing* interior." The Court, therefore, finds that the agreement between the parties required that the interior of the trailer be aesthetically pleasing.

■ Such a condition of satisfaction by one of the parties to the contract will only be excused if approval is withheld unreasonably. *See American Oil Company v. Carey,* 246 F.Supp. 773 (E.D.Mich.1965); RESTATEMENT (SECOND) OF CONTRACTS, § 228. In the instant case, upon review of photographs of the bracing structure and testimony of those experienced in this industry, and in light of the fact that the interior of the trailer should match that of a hospital and not a construction site, the Court finds that plaintiff's refusal to approve the aesthetics of the design was commercially reasonable. Given that an integral aspect of the trailer's function is to serve as a clinic for patients undergoing medical procedures, and given MMDI's clients' expectations after having viewed the trailer

at the open house, such a defect in the trailer's interior also reduced the value of the trailer substantially.

Upon review of the evidence, the Court finds that the bracing structure substantially impaired the value of the first trailer. Although the trailer met the express technical Philips' specifications for wall-flexing, it was never certified by the manufacturer. The failure of this condition does not relieve defendant of liability because it was defendant's failure to properly construct the trailer that prevented certification. In light of the specific facts and circumstances of this case, the Court finds that this deficiency substantially impaired the value of the installment. When coupled with the trailer's failure to conform with the aesthetic requirements of the contract and the delay caused by the cure attempt, the Court holds that the cure attempt clearly constitutes a substantial breach within the meaning of § 2–612(2).

Substantial impairment, however, does not in itself justify rejection of the installment. As noted above, the buyer must still accept tender if the defect can be cured and the seller gives adequate assurances. Under § 2–612, as opposed to § 2–609, it is incumbent upon the seller to assure the buyer that cure would be forthcoming. *See Bevel–Fold, Inc. v. Bose Corp.*, 9 Mass.App.Ct. 576, 402 N.E.2d 1104, 1108 (1980). Defendant has failed in this regard. The Court notes that neither E&W's statements during the December 13 conference call nor the letter sent the following day constituted adequate assurances. On the contrary, during the December 13 conference call, Andrew Pike, the President of E&W denied the existence of a defect, disclaimed any continuing obligation to cure under the contract, and stated that he did not believe a better design

could be made which would remedy the wall-flexing problem. Furthermore, on December 14, Mr. Pike again ignored the servicing problems that the bracing structure had caused, ignored the fact that the bracing structure had not been approved for permanent use by Philips, and reiterated his doubt that the design could be constructed in a more aesthetically pleasing manner. Under these circumstances, the Court finds that MMDI's rejection of E&W's cure on December 13 constituted a rightful rejection under § 2–612(2).[10]

### 3. Cancellation

#### a. Substantial Impairment of Contract as a Whole

The fact that rejection of one installment is proper does not necessarily justify cancellation of the entire contract. Under § 2–612(3) the right to cancel does not arise unless the nonconforming goods substantially impair the value of the *entire* contract. Indeed, as noted above, the very purpose of the substantial impairment requirement of § 2–612(3) is to preclude parties from canceling an installment contract for trivial defects. *Emanuel Law Outlines v. Multi–State Legal Studies*, 899 F.Supp. 1081, 1088 (S.D.N.Y. 1995).

Whether a breach constitutes "substantial impairment" of the entire contract is a question of fact. *Bill's Coal Co. v. Board of Public Utilities*, 887 F.2d 242, 247 (10th Cir.1989). To make such a determination, the Court should consider "the cumulative effect of [the breaching party's] performance under the contract, based on the totality of the circumstances...." *Neufer v. Video Greetings, Inc.*, 931 F.2d 56, 1991 WL 65439 (6th Cir.1991) (unpub-

---

**10.** Defendant argues that, as of December 13, it still had a right to cure under § 2–508 and that it was not required to give assurances unless plaintiff requested them in writing under § 2–609. The Court reiterates that, under § 2–508, defendant's right to cure was cut off on December 1. Furthermore, § 2–612, unlike § 2–609, does not require the aggrieved party to request assurances. In an installment contract, where the seller's right to cure is more expansive it stands to reason that the burden would fall on the seller to show that it had the present ability and the

intent to cure any remaining defect. *Allied Semi–Conductors Int'l Ltd. v. Pulsar Components Int'l, Inc.*, 907 F.Supp. 618 (E.D.N.Y.1995). In the instant case, defendant gave no indication that it either had the capability to satisfy the contract or the will to do so. On the contrary, E&W's President, gave MMDI the impression that cure was not possible and indicated clearly that he was not required to do anything more under the contract. Under such circumstances, MMDI's rejection was rightful.

**1016**

lished). Ultimately, "[w]hether the non-conformity in any given installment justifies cancellation as to the future depends, not on whether such non-conformity indicates an intent or likelihood that future deliveries will also be defective, but whether the non-conformity substantially impairs the value of the whole contract." § 2–612, cmt. 6. Thus, the question is one of present breach which focuses on the importance of the nonconforming installment relative to the contract as a whole. If the nonconformity only impairs the aggrieved party's security with regard to future installments, s/he "has the right to demand adequate assurances but [ ] not an immediate right to cancel the entire contract." § 2–612, cmt. 6. The right to cancel will be triggered only if "material inconvenience or injustice will result if the aggrieved party is forced to wait and receive an ultimate tender minus the part or aspect repudiated." § 2–610, cmt. 3 (noting the test for anticipatory repudiation under § 2–610 is the same as the test for cancellation under § 2–612(3)).

██ In the instant case, there is substantial evidence that one of the primary purposes of this contract was to provide MMDI with a fourth mobile MRI trailer so that it could meet the growing demand for its services. Thus, impairment of one of the four installments would have a substantial negative impact on MMDI. Moreover, an early delivery time was of primary importance to MMDI, as E&W was well aware. By failing to cure the November 28 breach on the first installment, E&W substantially delayed completion of the remainder of the contract which delayed MMDI's ability to begin use of the 1.5T MRI trailer it had promised to its customers at the open house on November 3. Having found that substantial injustice would be done to plaintiff if it were required to accept the remaining three trailers after substantial delay as satisfaction of the contract, the Court finds that plaintiff rightfully canceled the contract on December 18, 1995.

**4. Damages**

██ Having found that plaintiff rightfully rejected defendant's tender of cure on December 13, 1995, and subsequently properly canceled the contract, the Court finds that plaintiff is entitled to damages. Plaintiff has requested reimbursement of the amount it already paid for the nonconforming installment in the amount of $384,500 as well as damages in the amount of $185,250 incurred for the lease of a rental mobile MRI trailer between December 19, 1995 and April 20, 1996, to replace the trailer E&W failed to produce. Under § 2–711, a buyer who has rightfully canceled a contract may recover, among other things: 1) the amount that has already been paid, 2) damages for "cover" as defined in § 2–712, and 3) any damages of nondelivery, including consequential and incidental damages, as defined by § 2–715. Under § 2–715, incidental damages include "any [ ] reasonable expense incident to the delay or other breach." Thus, plaintiff is clearly entitled to return of the amount already paid for the item it never received. Plaintiff is also entitled to recover the amount paid for a replacement rental unit. Though this amount does not constitute cover it is allowable as incidental to the delay produced by E&W's breach. Had E&W made conforming tender on December 13, 1995, plaintiff would not have been forced to contract with another company for the trailers and to wait until spring for the first one. The Court, therefore, finds plaintiff is entitled to both expectation and consequential damages under the Code and awards plaintiff a sum total of $569,250 for the breach of contract claim.

**B. Misrepresentation**

██ As for Count II of plaintiff's complaint, the Court finds that plaintiff has all but abandoned its misrepresentation claim. Plaintiff neither argued the claim to the Court nor has it briefed the issue. If this was a strategic decision to redirect resources to the breach of contract claim on plaintiffs part, it was wise given that there was no evidence of misrepresentation presented, intentional or otherwise. This claim is, therefore, deemed waived and shall be dismissed.

**VI. CONCLUSION**

For the foregoing reasons, plaintiff is awarded expectation and incidental damages in the amount of $569,250. Plaintiffs claim of

misrepresentation is deemed waived and dismissed. Defendant's counterclaim for damages is denied and its motion for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c) is deemed moot.