**EXTRUSION PAINTING, INC., d/b/a International Extrusions, Plaintiff,**

v.

**AWNINGS UNLIMITED, INC., d/b/a Awnings by Sunair Defendant.**

**Civil No. 97–40345.**

United States District Court, E.D. Michigan, Southern Division.

Feb. 25, 1999.

Jack A. Gibson, Jr., George J.A. Heitmanis, Joann Weatherford, Kemp, Klein, Troy, Umphrey & Endelman, PC, MI, for plaintiff.

William D. Gilbride, Jr., Abbott, Nicholson, Quilter Esshaki & Youngblood, PC, Detroit, MI, for defendant.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

GADOLA, District Judge.

This is an action for breach of contract and quantum meruit. At the center of the controversy is a purchase order dated July 23, 1997 relating to the sale of awning parts, specifically "upper and lower arm extrusions."[1] The instant action commenced on August 25, 1997. Discovery closed on October 30, 1998 and the cut-off date for filing dispositive motions was December 31, 1998. On December 30, 1998, plaintiff Extrusion Painting, Inc. d/b/a International Extrusions (hereinafter "Intex") filed a motion for partial summary judgment.[2] Defendant Awnings Unlimited, Inc. d/b/a Awnings by Sunair (hereinafter "Sunair") responded on January 25, 1999. On January 4, 1999, the defendant filed its own motion for partial summary judgment. Plaintiff responded to defendant's motion on January 21, 1999. Although the cut-off date for filing dispositive motions was December 31, 1998, this Court will consider defendant's motion despite the fact that it was untimely filed on January 4, 1999.

A hearing on the parties' cross motions for partial summary judgment was conducted on February 17, 1999.

For the reasons set forth below, the Court will deny plaintiff's motion for partial summary judgment and deny defendant's motion for partial summary judgment.

## I. Factual Background

The instant case concerns the relationship between two companies. On one side of the transaction is the seller, plaintiff Intex. On the other side is the buyer, defendant Sunair. Plaintiff Intex is a family-owned Michigan Corporation which manufactures aluminum extrusions. Defendant Sunair is a family-owned Maryland corporation which manufactures lateral arm canvas awnings and sells its product principally at wholesale to home and garden centers.

---

1. The parties also refer to these items as "upper and lower arm profiles." Both designations are utilized herein.

2. Plaintiff Intex brings a motion for *partial* summary judgment, attempting to leave for trial the issue of how much credit should be given to defendant Sunair for the scrap value of the product still in plaintiff's possession. Defendant Sunair likewise moves for *partial* summary judgment, requesting dismissal of Count I of the complaint relating to plaintiff's allegation that defendant breached the purported contract between the parties and demanding damages in the amount of $179,-562.71.

## A. Prior Course of Dealing Between the Parties

According to defendant Sunair, prior to 1997 it had acquired most of its extruded aluminum from a Florida company called VAW of America. During this time, plaintiff Intex repeatedly solicited defendant's business. From time to time, defendant did buy extruded aluminum parts from plaintiff, but never upper or lower arm profiles, the product at issue in the case at bar. Defendant allegedly had refused to buy the upper and lower arm profiles from plaintiff in the past due to a "dimensional defect" in the die used to extrude the lower arm profile. See Exh. B to Defendant's Brief in Opposition to Plaintiff's Motion.

When plaintiff solicited defendant's business, it had distributed price quotations for the profiles. See Exhs. D and E to Defendant's Brief in Opposition to Plaintiff's Motion. Defendant always quoted in the quantity of "feet" and a standard material called 6063 T6 alloy. See id. According to defendant, plaintiff's distributor, the Astrup Company ("Astrup") always purchased the upper and lower arm profiles from plaintiff Intex in the quantity of feet and in 6063 T6 alloy. See Exh. F to Defendant's Brief in Opposition to Plaintiff's Motion.

In June 1997, a sales representative of plaintiff corporation, William Fouts, approached defendant Sunair. Sunair's president, Olof Martensson, allegedly indicated to Fouts that Sunair had reservations about doing business with plaintiff because of the dimensional problems with the arm extrusions. Fouts purportedly represented to Martensson that both the alloy and the die problem had been fixed. See Exh. H to Defendant's Brief in Opposition to Plaintiff's Motion. However, Fouts denies making any such representations. See Exh. I to Defendant's Brief in Opposition to Plaintiff's Motion. Martensson then allegedly decided to place a "trial order" with plaintiff Intex for the upper and lower arm profile. According to Martensson, he told Fouts that the order was to be a *trial order* and if plaintiff performed satisfactorily then defendant Sunair would place additional orders.

## B. Purchase Order Number 0007859 from Defendant to Plaintiff dated July 23, 1997.

The parties' dispute revolves around a purchase order dated July 23, 1997. It is uncontroverted that on that date defendant Sunair issued to plaintiff Intex a purchase order number 0007859. See Exh. J to Defendant's Brief in Opposition to Plaintiff's Motion. The purchase order listed the following items to be ordered from plaintiff corporation:

| 1,400 | EACH | /MISC | Upper Arm Profile | 20' WHT |
| 600 | EACH | /MISC | Upper Arm Profile | 20' BRW |
| 600 | EACH | /MISC | Upper Arm Profile | 20' SIL |
| 1,260 | EACH | /MISC | Lower Arm Profile | 18' WHT |
| 540 | EACH | /MISC | Lower Arm Profile | 18' BRW |
| 540 | EACH | /MISC | Lower Arm Profile | 18' SIL |

*Id. As interpreted by plaintiff-seller,* the above language meant that defendant was ordering 2,600 *pieces* of the upper arm profile in 20 foot lengths and 2,340 *pieces* of the lower arm profile in 18 foot lengths. Of the former amount, 1,400 pieces were to be painted white, 600 pieces were to be painted brown, and 600 pieces were to be painted silver. Of the latter amount, 1,260 were to be painted white, 540 pieces were to be painted brown, and 540 pieces were to be painted silver.

The order further stated "CONFIRM TO: Olof Martensson," the president of defendant Sunair, and was labeled "Delivery Urgent," requesting shipment in three weeks. No price term was specified, although plaintiff had previously faxed to defendant a price list on July 16, 1997. The purchase order was signed by Olof Martensson. A copy of the purchase order was also faxed to William Fouts, an Ohio-based manufactures representative. The person who faxed the order was Cheryl Page, an employee of defendant corporation. Ms. Page verified with the president of plaintiff Intex, Nicholas V. Noecker, that the order could be completed within a three week time period. Then, on July 24, 1997, Fouts faxed a

confirmation of delivery to defendant Sunair's president, Olof Martensson.

Upon receipt of the purchase order, plaintiff issued three separate order acknowledgments, one for each color. These acknowledgments were received by defendant Sunair on August 4, 1997. According to plaintiff, the standard procedure for handling mail at defendant corporation is that Mona Martensson, Olof. Martensson's wife and vice president of Sunair, would collect, open, and date stamp the mail and then forward it to Mr. Martensson for his review. If Mrs. Martensson were out of town, then Estelle Blankenship, the daughter of Mr. and Mrs. Martensson would handle the mail. On August 4, 1997, Mona Martensson was out of town. Mr. Martensson claims never to have personally received any of the acknowledgments from plaintiff.

### C. The Typographical Error

The parties appear to agree that the above-discussed purchase order contained a critical typographical error. Olof Martensson handwrote the purchase order and then gave it to his employee, Ms. Page, to type. *See* Handwritten Version attached as Exh. K to Defendant's Brief in Opposition to Plaintiff's Motion. The typed version differed from the handwritten version in one important respect, the quantity term. While the typed version, as quoted above, indicates that Sunair was ordering 2,600 "each" of the upper arm extrusions, the handwritten version clearly indicates that Martensson intended to order 2,600 "feet" of that type of extrusion. Similarly, with respect to the lower arm extrusion, the typed version indicates that Sunair was ordering 2,340 "each" of the lower arm extrusions, while Martensson had intended to order 2,340 "feet."

Plaintiff Intex upon its receipt of defendant's typed order interpreted the word "each" contained therein to mean "pieces." Accordingly, plaintiff began to manufacture 2,600 *pieces* of the upper arm extrusions and 2,340 *pieces* of the lower arm extrusions. The insertion of this one word—"pieces"—had a significant effect on the size of the order. Martensson intended to order a mere 130 pieces (2,600 feet) of the upper arm extrusions and a mere 130 pieces (2,340 feet) of the lower arm extrusions. Instead of $5,000 to $6,000 worth of product, as defendant anticipated, plaintiff manufactured extrusions for sale to buyer in the amount of $179,-562.71.

### D. Shipment of the Product on August 11, 1997 and Defendant Sunair's Actions Subsequent to Partial Receipt of the Order

On August 11, 1997, plaintiff began shipping parts to defendant. On August 13, 1997, defendant Sunair received all of the white upper and lower arm extrusions, i.e. 2,660 pieces of the 4,940 pieces allegedly ordered or approximately 53% of the total order. Sunair claims to have been "shocked to see the size of the order." *See* Defendant's Brief in Opposition to Plaintiff's Motion, p. 3; *see also* Aug. 13, 1997 Letter from Martensson to Fouts attached as Exh. O to Defendant's Brief in Opposition to Plaintiff's Motion. Instead of receiving a trial order, defendant received a three to four year supply of extrusions. Defendant immediately instructed plaintiff not to ship any more goods and that it would not accept any more shipments. *See* Aug. 13, 1997 Faxed Letter from Martensson to Mark Jackson of Intex attached as Exh. P to Defendant's Brief in Opposition to Plaintiff's Motion.

Plaintiff corporation agreed to stop shipment, at least until August 20, 1997, in a faxed letter dated August 13, 1997 to Martensson from plaintiff's president, Nicholas V. Noecker. *See* Exh. Q to Defendant's Brief in Opposition to Plaintiff's Motion. In that letter, Noecker suggested a conference call in order to discuss "either a volume purchase discount or some extended terms to help ease the burden associated with your purchase order." *Id.* On August 14, 1997, Martensson's daughter, Estelle Blankenship, faxed a message to Noecker indicating that Martensson was

out of the office and that he would contact him on August 15, 1997.

On August 15, 1997, Martensson replied in a letter to Noecker. *See* Exh. R to Defendant's Brief in Opposition to Plaintiff's Motion. That letter set forth Martensson's understanding that he and Fouts, plaintiff's representative, had agreed to a *trial offer.* Martensson admitted that there had been a typographical error in the purchase order, but also expressed surprise at plaintiff's interpretation of that order:

> We [Sunair] do not understand how your company [Intex] could put an order into production when our order said "each" not "pieces". Obviously, your company took it upon themselves to interpret "each" into "pieces". Each does not specify a quantity of extrusions. Obviously, it was a small typing error on our part. This error should have been questioned by your company right away .... the orders in 1996 and 1995 had always been ordered in feet.
>
> Your company always *quoted, confirmed* and *invoiced* in feet. Why would we, or your company, change the procedure[?]

*Id.* Martensson also remarked on the fact that plaintiff never raised a question regarding defendant's credit limit or a credit application.[3] The letter concluded that

> [w]e [Sunair] may accept an agreement to purchase some arm profile in January for our own 1998 production. If Astrup is willing to do the same we then hope this would deplete most of your merchandise. We will return the excess merchandise received. Do not send anymore [sic.] merchandise until this matter has been resolved.

*Id.*

In response to defendant's August 15, 1997, Noecker faxed Martensson a letter

on August 16, 1997. That letter stated that plaintiff would refuse any return of the "excess merchandise." *See* Exh. S to Defendant's Brief in Opposition to Plaintiff's Motion. Noecker further claimed that "we [Intex] did verify your purchase order with a confirmation mailed to you [ ] after you placed your purchase order." *Id.* Noecker acknowledged that defendant Sunair "may have made a mistake," but expected Martensson to take responsibility for that mistake on behalf of Sunair.

The final correspondence between the parties was a letter from Martensson to Noecker dated August 21, 1997. *See* Exh. T to Defendant's Brief in Opposition to Plaintiff's Motion. In that letter, Martensson made clear that the material received did not meet Sunair's standards and thus was "of no use to us." *Id.* Specifically, Martensson stated that the "upper arm profile is extruded within the tolerances required by Sunair [but] ... your lower arm profile is totally out of range." Id. As a consequence, the product had been marked "Cannot be Used" and was placed in Sunair's warehouse as Intex's property. Martensson also challenged the alloy's strength and concluded that "it does not meet our standards." *Id.* Defendant thus rejected the goods and asked plaintiff for instructions as to how the product should be returned. *Id.* Four days after this letter of August 21, 1997, plaintiff initiated the instant action.

## II. Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

**3.** In its brief, plaintiff attempts to rebut defendant's argument that the order exceeded the company's credit limit or that defendant should have been required to fill out a credit application. Plaintiff claims that a 2A–2 Dun and Bradstreet credit rating had been received by Intex with respect to Sunair on August 4, 1995. According to plaintiff, a 2A–

2 rating meant that Sunair's financial strength was estimated at between $750,000 to $999,000, with a composite credit analysis of "good." In plaintiff's view, the quantity of product allegedly ordered on July 23, 1997 was "very modest" in relation to Sunair's credit strength. *See* Brief in Support of Plaintiff's Motion for Summary Judgment, p. 6.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174(6th Cir.1984) (citation omitted). In evaluating a motion for summary judgment, the Court must view the evidence in a light most favorable to the nonmovant, as well as draw all reasonable inferences in the nonmovant's favor. *See U.S. v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir. 1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). This burden "may be discharged by showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed. R.Civ.Proc. 56(e); *Gregg*, 801 F.2d at 861.

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*,

> [t]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See Catrett*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

## III. Analysis

### A. Application of Michigan's Version of the Uniform Commercial Code

The first issue is which body of law is to be applied in the case at bar. Both parties base their arguments on Michigan law, in particular Michigan's adoption of the Uniform Commercial Code (hereinafter "U.C.C." or "Code"). *See* M.C.L. § 1101, *et seq.* As M.C.L. § 440.1105 provides, parties to a contract may agree on the law which will govern their rights and duties. However, if no such agreement exists, as in the instant case, "this act [Michigan U.C.C.] applies to transactions bearing an appropriate relation to this state." M.C.L. § 440.1105(1).

■ In the instant case, the purchase order was drafted by Sunair in Maryland. Thereafter, the order was sent to Intex's place of business in Garden City, Michigan and the order was to be performed through Intex's operations in Michigan. Therefore, this Court finds that a sufficient nexus exists with respect to the state of Michigan to trigger the application of Michigan law. Moreover, Michigan law recognizes that the nature and effect of a contract are governed by the law of the place where the contract was made, or if to be performed in another place, the law of the place where the contract is to be performed. *See Fireman's Fund Ins. v. Ex-Cell–O Corp.*, 750 F.Supp. 1340, 1346 (E.D.Mich.1990); *Leff v. NAC Agency*, 639 F.Supp. 1426, 1428 (E.D.Mich.1986); *Grossman v. Aristech Chem. Corp.*, 882 F.Supp. 110, 112 (W.D.Mich.1994).

**B. A contract was formed by plaintiff's purchase order dated July 23, 1997 and defendant's subsequent responses to that order.**

The instant case implicates basic issues of contract formation. Plaintiff argues that a contract was formed between the parties when plaintiff accepted defendant's purchase order through a series of written acknowledgments. Thus, according to plaintiff, defendant breached the contract upon refusing to pay the purchase price. Defendant on the other hand strenuously contends that no contract was formed, and even if a contract were formed there exists a question of material fact as to the terms of the contract. Defendant further maintains that it rejected the goods and therefore has no duty to pay plaintiff. In the alternative, defendant argues that defects in the extrusions substantially impaired the value of the installment and therefore defendant was justified in rejecting the shipment. The Court will address each of these arguments hereinbelow.

█ Michigan U.C.C. Article 2 applies to "transactions in goods," "[u]nless the context otherwise requires." M.C.L. § 440.2102. The term "goods" as used in Article 2 is defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ." M.C.L. § 440.2105. The transaction between defendant and plaintiff in the present case involved "goods," since the subject-matter of the transaction, upper and lower arm profiles, were "movable at the time of identification to the contract for sale." Accordingly, the Court will apply the rules contained in Article 2 for determining whether a valid contract has been formed between the parties.

█ Before a contract can be said to exist there must be both an offer and a valid acceptance. *Pakideh v. Franklin Comm'l Mortg. Group*, 213 Mich.App. 636, 640, 540 N.W.2d 777 (1995). In the instant case, it is undisputed that defendant's purchase order of July 23, 1997 constituted an offer. *See Aaron E. Levine & Co. v. Cal-*

*kraft Paper Co.*, 429 F.Supp. 1039, 1048 (E.D.Mich.1976) (holding that as a general rule orders are considered offers to purchase). It should also be noted that defendant's offer does not fail for lack of a price term. *Barto v. U.S.*, 823 F.Supp. 1369, 1373 (E.D.Mich.1993) (citing M.C.L. § 440.2201). As Article 2 makes clear,

(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(3) *Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.*

M.C.L. § 440.2201 (emphasis added).

As previously noted, although no price term was specified in the offer, plaintiff had previously, on July 16, 1997, faxed a price list to defendant.

In light of the above, the Court must next inquire into whether plaintiff Intex validly *accepted* defendant's offer. Pursuant to Article 2,

[u]nless otherwise unambiguously indicated by the language [of the offer] or circumstances

(a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances;

(b) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods, but such a shipment of nonconforming goods does not constitute an acceptance if the seller seasonably notifies the buyer that the

shipment is offered only as an accommodation to the buyer. M.C.L. § 440.2206(1). As the official commentary to Section 2–206 further provides, "[a]ny reasonable manner of acceptance is intended to be regarded as available *unless* the offeror has made quite clear that it will not be acceptable." M.C.L. § 440.2206, cmt. 1.

 Defendant argues that the purchase order unambiguously indicated "CONFIRM TO: Olof Martensson." Defendant maintains that plaintiff failed to send a confirmation of the order directly to Martensson's attention but instead sent three acknowledgments, one for each color, to the defendant corporation itself. These acknowledgments admittedly were received by Sunair on August 4, 1997. According to defendant, these three acknowledgments were ineffective as an acceptance because they were not sent to the attention of Olof Martensson, thus failing to satisfy the confirmation provision contained in the offer.

In support of its position, defendant cites *Independence Twp. v.. Reliance Bldg. Co.*, 175 Mich.App. 48, 437 N.W.2d 22 (1989) and *Dassance v. Nienhuis*, 57 Mich. App. 422, 225 N.W.2d 789 (1975), as standing for the proposition that no contract is formed unless acceptance is made "in strict conformance with the offer." *See Independence Twp.*, 175 Mich.App. at 53, 437 N.W.2d 22. However, these cases are distinguishable from the instant case. Neither *Independence Twp.* nor *Dassance* involved a contract for the sale of goods, but rather a bid for construction services in the case of the former and a real estate contract in the case of the latter. Since neither of these cases involved the sale of goods, these cases did not involve the application of U.C.C. Article 2. Rather, these courts applied common law rules governing contract interpretation.

The Uniform Commercial Code departs somewhat from the "strict conformance" rule embodied in the pre-existing common law of contracts. As quoted above, Section 2–206 provides that a party must unambiguously indicate via the language of the offer if a special mode of acceptance is required. Barring such an explicit and clear stipulation in the offer, any "reasonable manner of acceptance" is available to the offeree. *See* M.C.L. § 440.2206, cmt. 1. This rather liberal provision furthers the underlying policies which motivated the drafting of the Code: "to simplify, clarify and modernize the law governing commercial transactions; to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; to make uniform the law among the various jurisdictions." *See* M.C.L. § 440.1102(2)(a), (b) & (c) (subsection letters omitted).

Applying Section 2–206 to the instant case, it is apparent that defendant's argument that plaintiff never accepted its offer must fail. While it is true that defendant indicated on the purchase order that confirmation was to be directed to Olof Martensson, this can hardly be interpreted as satisfying Section 2–206's requirement that the offeror unambiguously indicate by the language of the offer that this was to be the exclusive method of acceptance. Given Article 2's preference for any "reasonable manner of acceptance" under the circumstances, defendant has not succeeded in exempting itself from this general rule.

At the hearing held February 17, 1999, plaintiff maintained that it had complied with defendant's offer in that it directed the acknowledgments to defendant corporation and that during the normal course of business at Sunair all correspondence was routed to Olof Martensson personally. As stated above, Mona Martensson testified that she would collect, open, and date stamp the mail and then forward it to Mr. Martensson for his review. If Mrs. Martensson were out of town, then Estelle Blankenship would attend to the mail. In spite of this specific and credible testimony provided by his employees, Mr. Martensson still maintains that he never personally received the acknowledgments. The Court finds that defendant has failed to

overcome the presumption created by the existence of Sunair's ordinary course of business practices.

■ Even assuming *arguendo* that defendant's offer could be interpreted as requiring acceptance to be valid only if specifically directed to Olof Martensson and not to the defendant corporation generally, plaintiff has submitted a faxed letter dated July 24, 1997 from plaintiff's sales representative William Fouts to Olof Martensson. *See* Exh. 85 to Plaintiff's Brief in Opp. to Defendant's Motion for Partial Summary Judgment. The letter contains the language "ATTN: Olof Martensson" and states that "Intex can deliver your order in three weeks provided we package material in master bundles which would consist of nine pieces per bundle...." *Id.* In the lower half of the letter, the following handwritten words appear: "Intex will ship by their carrier [with] best discount/prepaid per Mark Jacksen, 7/24, CT." *Id.*

Defendant argued at the hearing that Fouts's letter to Martensson dated July 24, 1997 does not qualify as an acceptance because it fails to specifically recite the terms listed in defendant's offer. However, no such "recitation" requirement exists. In fact, pursuant to U.C.C. Section 2–206, "an order or other offer to buy goods for prompt or current shipment [such as is found in this case] shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods...." M.C.L. 440.2206(1)(b). This letter from Fouts to Martensson represents a prototypical example of a "prompt promise to ship" and therefore qualifies as a valid acceptance under Section 2–206. Accordingly, the Court finds that this letter, in and of itself, qualifies as a valid acceptance which was sent by an agent of plaintiff corporation and forwarded directly to Martensson.

In light of the above, the Court holds that plaintiff did accept defendant's offer and therefore a valid contract was formed by the parties.

**C. Even though the required elements of a valid contract are present in the instant case, the parties' respective motions for partial summary judgment must be denied because of the existence of several genuine issues of material fact.**

Although this Court has determined that an enforceable contract was created, this does not mean that partial summary judgment is appropriate. As discussed previously, the movant must still meet its burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir.1986). In the instant case, several issues of material fact are still in dispute. The Court will address each of these immediately below, cataloguing for the record the parties' opposing positions.

**1. There is a genuine issue of material fact regarding the meaning of the ambiguous quantity term utilized in the typed version of defendant's purchase order.**

The first issue still in dispute concerns the meaning of the quantity term found in defendant's offer of July 23, 1997. According to defendant, the term "each" was placed in the offer due to a typographical error. Instead, the offer should have stated that defendant was ordering in terms of "feet." This contention is supported by the handwritten version of the purchase order produced by defendant. *See* Exh. K to Defendant's Brief in Opposition to Plaintiff's Motion. Plaintiff, however, interpreted the term "each" to mean "pieces" and thus proceeded to supply defendant with a three to four year supply of extrusions. Plaintiff on the basis of its interpretation of this key term now moves for partial summary judgment.

■ The Court finds the term "each" used in the context of the purchase order in the instant case to be ambiguous. Where the terms of a contract are unambiguous, then construction of the contract is a question of law for the Court to decide.

*S.C. Gray v. Ford Motor Co.*, 92 Mich.App. 789, 816, 286 N.W.2d 34 (1979). However, it is well-settled that where a contract is ambiguous, such as in the present case, and where its meaning must be determined by "extrinsic unconceded facts," construction of the contract is "then a question of fact, or mixed question of law and fact, for the jury." *Hewett Grocery Co. v. Biddle Purchasing Co.*, 289 Mich. 225, 236, 286 N.W. 221 (1939).

■ Moreover, Article 2 of the U.C.C. provides that terms appearing in a contract, while they may not be *contradicted* by evidence of a prior agreement or of a contemporaneous oral agreement, *may however be explained or supplemented*

(a) by course of dealing or usage of trade (section 1205) or by course of performance (section 2208); and (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

M.C.L. § 440.2202. When a quantity term is not precisely stated, parol evidence will be admissible to help explain what in fact the parties intended to be the exact quantity. *Matter of Estate of Frost*, 130 Mich. App. 556, 561, 344 N.W.2d 331 (1983).

■ In the case at bar, the meaning of "each" is not immediately apparent and is a question of fact to be determined from the parties prior course of dealing, trade usage and course of performance. As the official commentary to Section 2–202 states, "the course of actual performance by the parties is considered the best indication of what they intended the writing to mean." M.C.L. § 440.2202, cmt. 2. The dispute is further underscored by defendant's contention that Martensson explicitly stated to William Fouts, plaintiff's representative, that the purchase was to be a "trial order." *See* Depo. of Olof Martensson, attached as Exh. H to Defendant's Brief in Opposition to Plaintiff's Motion. Fouts denies that he was ever told that this was to be a "trial order." *See* Depo. of William Fouts, attached as Exh. I to Defendant's Brief in Opposition to Plaintiff's Motion.

## 2. There is a genuine issue of material fact whether defendant rightfully rejected the shipment as nonconforming goods.

■ Defendant argues that Sunair rightfully rejected the goods upon its receipt of non-conforming goods. According to defendant, the extrusions failed to conform to the parties' contract in several respects, including (1) quantity, (2) color, (3) tensile strength, and (4) dimensional specifications. As discussed above, the parties are in dispute with regard to the quantity of pieces ordered. In addition, the parties dispute each of these remaining three criteria, defendant arguing that the criteria were not met and plaintiff arguing that it has fully complied with the order. As will be shown below, these disputes involve strictly factual questions and thus must be resolved by the trier of fact and may not be decided by the Court at this point in the litigation.

The general rule applicable to a single delivery contract is "if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may (a) reject the whole; or (b) accept the whole; or (c) accept any commercial unit or units and reject the rest." M.C.L. § 440.2601. This is known as the "perfect tender rule" and requires "a very high level of conformity ... [whereby] the buyer may reject a seller's tender for any trivial defect, whether it be in the quality of the goods, the timing of performance, or the manner of delivery." *Midwest Mobile Diagnostic Imaging, L.L.C. v. Dynamics Corp. of America*, 965 F.Supp. 1003, 1011 (W.D.Mich.1997). However, the Code mitigates the harsh effects that would otherwise result from such a rule by providing the buyer with a correlative "right to cure" pursuant to Sections 2–508. *See id.*

Based on the various alleged defects mentioned above, defendant maintains that it had the right to reject the goods pursu-

ant to Section 2–601. However, as stated, the Court is not in a position to resolve this issue because there exists a question of material fact as to which shade of "white" was denoted when defendant utilized the term in its purchase order. Plaintiff argues that the white which it used to paint the upper and lower extrusions was H.B. Fuller *6035*, a standard color which Intex had used in previous transactions with Sunair. Martensson, however, in his deposition denies that this color was used previously and testified that Sunair had used only H.B. Fuller *1385*. Therefore, a genuine question of material fact exists as to the prior course of dealing between the parties.

Moreover, there exists a genuine question of material fact with respect to the tensile strength of the material ordered. Defendant claims that Intex had quoted a tensile strength of 6063–T6 for the material. *See* Exhs. B & D to Defendant's Brief in Opposition to Plaintiff's Motion. However, upon confirming the order, plaintiff changed the specification 6063–T6 to 6063–T5. *See* Exh. M to Defendant's Brief in Opposition to Plaintiff's Motion. According to defendant, the T5 specification has a lower tensile strength and is thus more likely to break or bend. *See* Exh. U to Defendant's Brief in Opposition to Plaintiff's Motion.

Lastly, there exists a genuine question of material fact with respect to the dimensional specifications of the extrusions. Martensson in his deposition testified that he explained to Fouts, plaintiff's representative, that he had reservations about the die used to manufacture the parts. *See* Exh. H to Defendant's Brief in Opposition to Plaintiff's Motion. Martensson testified that Fouts indicated that the problem with the die had been corrected, and that based on this representation Martensson decided to place the trial order with Intex. *Id.* Fouts denies ever making any such representation. *See* Exh. I to Defendant's Brief in Opposition to Plaintiff's Motion. According to defendant, the lower arm profiles received from Intex "have an inside dimension which is too small[,] preventing

the required part from fitting into it. To make it fit, Sunair would have to grind the parts." *See* Defendant's Brief in Opposition to Plaintiff's Motion, p. 13.

Accordingly, neither plaintiff nor defendant has met its burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). Ample evidence has been presented by both sides to warrant a trial in the above-entitled matter.

3. **Assuming *arguendo* that the parties agreed to an installment contract, there is still a genuine issue of material fact as to whether the alleged defects in the goods "substantially impaired" the value of the installment and/or of the entire contract.**

As a final point, plaintiff attempts to counter defendant's contention that Sunair had a right to reject the goods by arguing that the agreement between the parties "might also be perceived as an installment contract." Plaintiff's Brief in Support of Motion for Partial Summary Judgment, p. 14. Pursuant to U.C.C. Section 2–612, "[a]n 'installment contract' is one which requires or authorizes the delivery of goods in separate lots to be separately accepted. . . ." The Section further states that "[t]he buyer may reject any installment which is nonconforming if the nonconformity *substantially impairs* the value of that installment and cannot be cured or if the nonconformity is a defect in the required documents. . . ." M.C.L. § 440.2612.

The threshold issue which first must be addressed is whether an installment contract was entered into by the parties. Neither defendant's purchase order nor plaintiff's acknowledgments contains a clause explicitly allowing for separate deliveries of the product. However, according to the official commentary to Section 2–612, "[t]he definition of an installment contract is phrased more broadly in this Article so as to cover installment deliveries *tacitly authorized* by the circumstances or

by the option of either party." *See* M.C.L. § 440.2612, cmt. 1 (emphasis added). In addition, the contract at issue need not specify different "lots" to be delivered, but may be phrased in terms of commercial units. *See Midwest Mobile Diagnostic Imaging,* 965 F.Supp. at 1010 (holding that Section 2–612 "applies wherever a contract for multiple items authorizes the delivery of the items in separate groups at different times, whether or not the installment constitutes a commercial unit").

Applying the above rules, the Court finds that the contract between the parties tacitly authorized delivery in installments, and thus may be characterized as an installment contract. However, there still exists a genuine issue of material fact as to whether the alleged defects in the product "substantially impaired" the value of the installment and/or of the entire contract. "To establish substantial impairment of the value of an installment, the buyer 'must present objective evidence that with respect to its own needs, the value of the goods was substantially impaired.'" *See Midwest Mobile Diagnostic Imaging,* 965 F.Supp. at 1012 (citing *Arkla Energy Resources v. Roye Realty & Dev., Inc.,* 9 F.3d 855, 862 (10th Cir.1993)); *see also* M.C.L. § 440.2612, cmt. 4. The determination as to whether the alleged breach constituted a "substantial impairment" of the entire contract is dependent upon "the cumulative effect of [the breaching party's] performance under the contract, based on the totality of the circumstances...." *Midwest Mobile Diagnostic Imaging,* 965 F.Supp. at 1015. Both of these questions regarding "substantial impairment" are questions of fact to be decided at trial by the fact-finder.

In light of all the foregoing considerations, this Court shall deny both parties' motions for partial summary judgment. There exist various genuine issues of material fact which remain outstanding and must be forwarded to the jury for its consideration.

*ORDER*

**NOW, THEREFORE, IT IS HEREBY ORDERED** that plaintiff's motion for partial summary judgment is **DENIED;** and

**IT IS FURTHER ORDERED** that defendant's motion for partial summary judgment is **DENIED.**

**SO ORDERED.**